237 So.2d 270 (1970)
STATE ROAD DEPARTMENT, a Component Agency of the State of Florida, Appellant,
v.
HOUDAILLE INDUSTRIES, INC., a Michigan Corporation, Rubin Construction Company, a Tennessee Corporation, and E. & I., Inc., a Florida Corporation, Appellees.
No. M-199.
District Court of Appeal of Florida, First District.
July 7, 1970.
*271 Wicker, Smith, Pyszka, Blomqvist & Davant, Miami, for appellant.
Robert M. Ervin, Carl R. Pennington, Jr., and F. Perry Odom, of Ervin, Pennington, Varn & Jacobs, Tallahassee, for appellees.
RAWLS, Judge.
The State Road Department appeals a final judgment in favor of appellees-plaintiffs in the sums of $240,000 (on Job 3502) and $70,000 (on Job 3501) plus interest and costs.
The primary points posed by appellant on this appeal are: 1. Whether there existed an accord and satisfaction on the part of plaintiffs by reason of a change order, 2. The propriety of joining E. & I., Inc., a sub-subcontractor, as party plaintiff, 3. The sufficiency of the evidence to show a breach of contract or misrepresentation made by the Road Department, and 4. Adequacy of the evidence to support the finding of damages by the trial judge.
This cause was submitted to the trial judge sitting as a finder of fact upon a voluminous record from which the following facts are drawn. The State Road Department desired to construct across the Everglades a road to be known as the Everglades Parkway but commonly called Alligator Alley. Much of the terrain had never been subjected to topographic survey. For a period of five months the Road Department utilized four fully equipped survey crews who completed the survey work and made subsoil investigations which were used in the preparation of plans and specifications. The construction was let in a series of projects including Projects 3502 and 3501, the two involved in this controversy. The prospective contractors had less than a month for preparing estimates and pre-bid inspections prior to submitting bids as to each project. The pre-bid inspections consisted primarily of aerial views, for ground inspection was necessarily confined to those parts accessible by *272 swamp buggy. The pre-bid inspection conducted on behalf of Houdaille showed no indication of any inaccuracy in the data supplied by the Road Department with the invitation to bid.
Houdaille was the successful bidder as prime contractor on Projects 3502 and 3501, and it subcontracted a portion of the work entailing clearing, grubbing, subsoil excavation and embankment work to Rubin Construction Company with the Road Department's written approval. Rubin subsubcontracted the work to E. & I., Inc., without the required written approval of the Road Department. E. & I. had a qualification rating with the Road Department whose engineers and inspectors knew that E. & I. was doing the work and whose records reflect that E. & I. participated in work conferences.
As to Project 3502, the plans reflected only 408 cubic yards of muck to be moved and 622,968 cubic yards of embankment material to be taken from the borrow canal and put into place by the contractor. The contract for this project was let in mid-October 1964 at the end of the rainy season but before the waters had receded. The rains normally start again the last of June or first of July. The work plan was to use bulldozers to uproot vegetation which would be allowed to dry, then raked into piles and burned. It was anticipated that the inland waters would recede during the dry season as the work progressed inland and that bulldozers (which can clear 6 acres a day) could do all clearing except the strip estimated by the Road Department to contain 408 cubic yards of muck. As to the muck area, the work plan required that draglines would remove the muck, take stable soil from the borrow canal designated in the plans, place same near the roadway, and bulldozers would push the embankment material in place. Thus, it was anticipated that all embankment material would be in place before the rains started which would permit the paving of same during the rainy season because the high embankment would be above the waterline.
The Road Department's estimate of muck quantities made after it had expended some five months in pre-planning survey work was, to say the least, erroneous. After clearing and grubbing one and one-half miles, the subcontractor encountered muck in quantities astronomically in excess of those represented in the plans. Correspondence between Road Department engineers in January 1965 revealed that the muck was so soft it could not be walked on nor could track equipment work on it; that the data shown on the plans represented only the best areas; that it appeared there was no way for the survey team to have carried equipment to some stations to take soil borings, and the borings shown on the plans for such stations appear to have come from other stations; that the muck was then estimated to be some 200,000 cubic yards; and that the contractor in spite of difficult conditions had brought in a great deal of equipment and was progressing well but had not submitted a price for his additional work.
The contractor's entire method of construction operation had to be changed. Instead of using bulldozers which could clear 6 acres in a 10-hour day, draglines working on mats had to be used 24 hours a day to clear two and one-fourth acres. The Road Department inspectors refused to allow the draglines to do a dual operation, that is, to clear and remove muck at one time because the plans stated that clearing and grubbing must be accomplished before removal of subsoil. As the draglines progressed further into the muck they could not be reached by swamp buggies. Housing on the site was set up for the workers. Swamp buggies would carry them as far as possible, and they would have to wade or climb along piles of trees to get to and from the equipment. Fuel had to be floated and carried in by hand. Some workers objected to wading through snake-infested waters. Accident rates were high. Equipment was constantly bogged down. Personnel *273 turnover exceeded 500%; and the contractor finally paid bonuses to get workers to remain on the job. There is no question but that the failure of the Road Department to procure and submit to prospective contractors accurate soil borings from each station constituted a material false representation in the invitation to bid.
On March 29, 1965, a meeting was held in Tallahassee with representatives of the Road Department, the contractor, subcontractor and sub-subcontractor (E. & I.). At this meeting the plans were officially changed to require the removal of the muck; to designate the places and manner of disposal of the enormous quantities of muck; to authorize payment for stripping muck from the top of the proposed borrow canal along the roadway, payment for overhaul at 5¢ per cubic yard, and a progress payment of 55% for material excavated from the borrow canal; and to specify the source of limerock material. The Assistant Engineer of the Road Department, by memo dated March 30, 1965, directed the District Engineer to prepare a document showing the changes stated above and to include therein an estimate of anticipated units for overhaul, increased excavation and increased embankment material. The document as prepared reflected contract unit prices and was signed by a representative of the contractor but was neither executed nor processed by the Road Department as is required for change orders.
The excavation and soil removal proceeded according to the mentioned document, and progress payments were made in accordance therewith. 62,392 cubic yards of overburden was removed from the top of the borrow canal; 278,392 cubic yards of muck instead of the 408 shown in the plans was moved; and 827,750 cubic yards of embankment material rather than 622,968 was needed. Large quantities of embankment materials after being dug from the borrow canals and placed in the stockpiles would disappear into the muck or even into the ground where there was no muck, and the above figures do not reflect this loss. The document prepared by the District Engineer which the Road Department now terms a "change order" did not cover the additional expense of clearing and grubbing, although this phase of the operation, due to the existence of the additional muck, extended into the rainy season and compounded all the problems and expense.
Project 3501 also presented problems. The terrain was a sandy material, excellent for embankment purposes, and visual inspection indicated that the conditions were those as represented in the plans. The plans and specifications which the contractor utilized in computing its bid showed that at one location rooty material could be found to a depth of one foot. Instead of the condition being that indicated by the plans, the major part of the first eight miles of the canal being dug paralleling the roadway contained extensive quantities of roots sometimes extending to a depth of 30 feet and so thick that they would gather on the cutting blade of the pans and prevent the pans from picking up a full load. When embankment material was spread on the roadbed, it became necessary to use bulldozers to rake out the roots, but since they didn't get them all, the Road Department required that embankment material be spread in layers only 3 inches thick and that hand labor come behind to pick up all roots remaining. A Resident Engineer instructed the contractor to get out the roots down to the size of a hair. The land labor was so slow, the pans often had to stop operations. The contractor attempted to use other types of mechanical devices, farm tractors which hydraulically operated spring tooth rakes and a trash picking-up machine, to extract the roots, but these proved unsatisfactory to the Road Department. All available hand laborers were employed, but the most they ever had was forty and that was not enough. Even then the State would not allow the laying of 6 inches of material at a time as stated in the specifications.
*274 On March 1, 1966, an Assistant State Engineer wrote the District Engineer that the State's personnel was being "overzealous" in requiring the removal of all roots and that such was an "impossibility in the Everglades." He instructed the District Engineer to instruct the inspector to use some plain common sense, without unduly persecuting the contractor. The order to hand pick the roots was subsequently withdrawn. The presence of the unprecedented quantity of roots and the requirement to hand pick same had slowed up the job schedule and prevented the completion of the embankment before the rainy season began. Once the rains started the pans could no longer be used and expensive draglines were brought in to excavate. The material had to be stockpiled for drying before being moved to the roadway. Draglines could not spread the material like pans and pans were used for this purpose on the roadway, so this portion of the project became a three-operation job instead of one.
Houdaille's action is predicated primarily upon the inaccurate plans and specifications submitted by the Road Department in its invitation to bid and it seeks damages for the unusual and costly construction procedures and extra work that was required to complete the respective projects.
The Road Department strenuously contends that payment under the March 29, 1965, "change order" was an accord and satisfaction as to Project 3502. It was and is the contractor's position that the unit price stated in the March 29, 1965, document was solely for the purpose of progress payments for the extra work with final settlement to come after the full situation was revealed. The contractor's position is buttressed by the testimony of a Road Department representative who stated that he led the fight for reduced unit costs at the meeting but that a contractor's representative insisted that it should be increased and so he (the Road Department's representative) concluded that "in the absence of successful renegotiations, which we certainly were unsuccessful in", the contract price should prevail.
An accord and satisfaction is the substitution of a new agreement between the parties in satisfaction of a former one, and arises when the agreement is executed and satisfaction has been made. 1 Fla.Jur., Accord and Satisfaction § 1. It is elementary that in the absence of a meeting of the minds no new agreement was ever entered into. The trial judge in reaching his decision obviously relied upon the fact that the Road Department did not execute or process the document in the manner required for a valid change order; that the document did not dispose of that portion of the contractor's claim for the additional expenses incurred in clearing and grubbing occasioned by the presence of the additional muck; that the Road Department admittedly refused to negotiate on that phase of the dispute; and that the testimony of a Road Department representative clearly showed that the parties never reached a mutual agreement on the final unit prices for excavation and embankment, although they did agree on certain changes in the plans and a method for progress payments. Such an agreement can hardly be classified as one in satisfaction of the former contract between the parties. There is ample substantial evidence to sustain the trial judge's finding that an accord and satisfaction was not reached in the execution of this instrument.
We next consider the appellant's question dealing with the propriety of joining E. & I., Inc., as a party plaintiff. The appellant is not in a position to seriously argue this point. At the outset of this controversy, the Road Department moved to dismiss the first complaint filed by Houdaille on the grounds of failure to join indispensable parties which resulted in a second amended complaint being filed naming all three plaintiffs. The Road Department again moved to dismiss the second amended complaint for failure to join indispensable parties and at that time raised no *275 objection to joining E. & I. as a party plaintiff. In addition, the Road Department counterclaimed against each of the plaintiffs, including E. & I. Thereafter, the Road Department filed its "affirmative defense" alleging for the first time that E. & I. was not a proper party. The lower court considered this pleading as a motion to dismiss and denied same. With this denial we agree. Other than the waiver by pleading, it is noted that the Road Department knew from the outset of the performance of the contract that E. & I. was on the job performing work and at no time did it object to E. & I.'s participation in the phase of work it was accomplishing. It was only after E. & I. completed performance of its contract with its principal, Rubin, and only after the extensive pleadings recited above did the Road Department first raise the question of privity between it and E. & I. Furthermore, E. & I. is a real party in interest as contemplated by Rule 1.210, Florida Rules Civil Procedure, 30 F.S.A., and its presence in this lawsuit contributed to an expeditious settlement of all of the controversies posed, thereby preventing a multiplicity of suits.
We next go to the Road Department's contention that the trier of fact was presented with insufficient evidence upon which it reached the amount of damages it found to be due from the Road Department to plaintiffs. To say the least, this was a complicated case, involving extensive questions of fact. The trial judge was called upon to unravel the various and sundry contentions of each party concerning highly technical matters and to consider numerous damages sustained by the respective plaintiffs that were not capable of mathematical exactness. After hearing the technical witnesses and considering the work contemplated, predicated upon the Road Department's plans and specifications, together with the work plan contemplated by the respective plaintiffs, and weighing these factors with the actualities as they occurred, all being proximately caused by the Road Department's misrepresentations and failure to reasonably perform its responsibilities, we conclude that the trier of fact reached a just and equitable result. There is substantial competent evidence in this record to sustain the amounts reached by the trial judge, and the sums so found by him to be due by the Road Department to the plaintiffs shall stand.
Other claims and counterclaims have been submitted in this appeal dealing with questions of interest, costs and admissibility of evidence. We have carefully considered each point presented by the respective parties and conclude that no reversible error has been clearly shown. The final judgment rendered by the trial judge is
Affirmed.
JOHNSON, C.J., and CARROLL, DONALD K., J., concur.