362 So.2d 1009 (1978)
JACKSONVILLE PORT AUTHORITY, a Body Politic and Corporate, Appellant,
v.
PARKHILL-GOODLOE CO., INC., a Florida Corporation, Appellee.
No. FF-257.
District Court of Appeal of Florida, First District.
October 3, 1978.
As Corrected October 18, 1978.
Dawson A. McQuaig and William Lee Allen, Jacksonville, for appellant.
Neil C. Taylor of Toole, Taylor, Moseley, Milton & Joyner; and Aubrey L. Coleman, Jr., of Smith, Currie & Hancock, Atlanta, Ga., for appellee.
McCORD, Chief Judge.
This appeal is from a final judgment finding appellant, Jacksonville Port Authority, liable to appellee Parkhill-Goodloe Co., Inc., for damages to its equipment and additional costs incurred for extended time required to complete a dredging contract which was awarded to appellee by appellant. The alleged damages resulted from the unexpected dredging of rock in carrying out the terms of the contract. We affirm.
The trial court in its final judgment stated as follows:
"Prior to bidding, the Plaintiff reviewed the boring reports furnished by the Defendant, as well as making `on-site' probings themselves in conjunction with other prospective bidders. Neither the boring reports of the Defendant nor the probings by the Plaintiff indicated any significant rock in the area. The area in question was Bid Item No. 3 of the contract. During dredging to the required depth of 38 feet, rock was encountered as high as 35 feet but mostly around 37 feet. The defendant claims that Plaintiff was on notice of possible rock because of prior experience in dredging in an area immediately east of Bid Item No. 3 area when *1010 the Plaintiff had scraped over rock in dredging the 36 feet. In such prior dredging the Plaintiff had incurred no difficulty in reaching the 36 feet depth which would put it on notice of any significant rock. Another company had later dredged the area east of Bid Item No. 3 and incurred rock and made a claim against the Defendant. The Plaintiff claims that this information should have been disclosed to bidders and failure to do so constituted fraudulent misrepresentation, breach of contract, breach of implied or expressed warranty which give rise to liability on the part of the Defendant. Additionally the Plaintiff seeks relief on the grounds of mutual mistake and quantum meruit.
The Defendant additionally claims that the Plaintiff dredged too deeply and should not be able to claim damages for delay resulting therefrom. Because of the difficulty in maintaining absolute control of dredging equipment, the dredging contract provided for compensation to the depth of 40 feet  2 feet beyond the minimum required depth. The uneven surface of the rock encountered and the methods required to extract and remove the rock created the possibility of going deeper than 40 feet in some areas. There was some discrepancy likewise in depths reported by the Plaintiff and the Defendant, but nothing significant in the Court's view.
The Court finds that the Plaintiff relied on the boring reports furnished by the Defendant and had a right to do so and its own `on-site' probings also did not reflect any significant rock to be encountered in the dredging. Further, the Defendant was on notice of rock in the area because of the prior claim from a prior contractor dredging in an adjacent area and the Defendant did not disclose the possibility of rock to the bidders, including Plaintiff, on the contract. The Court finds that Defendant had a duty to make known to the bidders on this project its full knowledge of the possibility of rock in this area. The Plaintiff incurred damages to its equipment and incurred damages for extended time to complete the dredging work for which the Defendant is responsible."
From a review of the record and the briefs of the parties, we agree with the foregoing findings and conclusions of the trial court.
The dispute here involves only Bid Item No. 3 of the bid documents which was for dredging in a certain area to a minimum depth of minus 38 feet mean low water with provision that payment would be made for going as deep as minus 40 feet. Addendum No. 1 to the contract documents issued by appellant to all prospective bidders added 13 pages consisting of seven core boring reports made by Law Engineering Testing Company for appellant at a cost to appellant of $7,271. These core boring reports indicated that the materials likely to be encountered in the area within the 38 foot depth were sand, silt, and limestone fragments. One of the seven borings showed rock at 37.1 feet and two at 40 feet. Appellee, along with two other prospective bidders, made 10 less sophisticated probings in the area which appeared to confirm the information obtained from appellant's six borings  rock was not found within 40.8 feet depth. Upon commencement of dredging operations, appellee began encountering an extensive amount of fixed, solid and heavy rock. The rock which was dredged was found in peaks with holes right next to them and was encountered as shallow as minus 33 feet. Appellee is not a rock dredger and does not bid on projects which involve rock dredging of any significant amount. As a result of the large quantities of rock encountered, appellee damaged its dredge pumps and pipelines and spent an additional 19 days in the area of Bid Item No. 3 above what would have been required had only sand, silt and limestone fragments been present.
Upon encountering the rock, appellee called the project engineer for appellant and advised that rock was being encountered and that a claim would be submitted. The project engineer told appellee to go ahead and submit a claim and that it would *1011 be considered. Appellee advised appellant that since it had suffered extensive damage to its equipment, it was discontinuing dredging of the rock. Appellant responded and advised that discontinuance of the dredging of the rock would be construed as a breach of the contract, but that any claim submitted by appellee because of the rock would be given careful and thorough consideration. Appellee then resumed dredging of the rock at additional expense and damages. Upon completion of the dredging contract, appellant denied appellee's claim.
As alluded to by the trial court, the evidence shows that a dredging contractor on an earlier project for appellant in the adjacent area in dredging the same depth as required in appellee's contract had to dredge an average of seven or eight feet of rock. This information had not previously been furnished to appellee and the other bidders by appellant.
In support of its position, appellant relies upon the following provisions of the contract between it and appellee:
"1. Examination of Drawings, Specifications and Site of Work

The Bidder is advised, before submitting his proposal, to visit the site of the proposed work and familiarize himself with the nature and extent of the work and any local conditions that may in any manner affect the work to be done and equipment, materials and labor required. He is required to examine carefully the drawings and specifications and contract forms, and to inform himself accurately regarding any and all conditions and requirements contained herein that may in any manner affect the work to be performed. No allowances will be made for conditions overlooked by the Contractor."
"12. Borings

Boring information shown on the Drawings or furnished with the specifications, or both, is not guaranteed to be more than a general indication of the materials likely to be found adjacent to holes bored at the site of the work approximately at the locations indicated. Bidders shall examine boring records and interpret the subsoil investigation and other preliminary data for himself, and shall base his bid on his own opinion of the conditions likely to be encountered. It is mutually agreed that the submission of the proposal shall be considered prima facie evidence that the bidder has made examinations."
"9. Dredging and Disposal of Material

Dredging shall be required to the depths as shown on the Drawings. All materials of whatever nature encountered shall be removed to the depths shown."
Appellant contends that under the above provisions, it was the responsibility of appellee to satisfy itself as to the nature of the material to be dredged and that, therefore, appellant is not liable for the unexpected rock dredging of the material to be dredged. Of particular significance, however, is the above statement in the contract that the boring information furnished "is not guaranteed to be more than a general indication of the materials likely to be found adjacent to holes bored at the site of the work approximately at the location indicated." From the evidence, it appears that the holes drilled by appellant did not show that the underwater rock structure was in peaks and valleys with peaks extending into the area to be dredged. The negative language of the contract quoted above constitutes a guarantee that the boring information furnished by appellant gave a general indication of the materials likely to be found adjacent to holes bored at the site of the work approximately at the locations indicated. The information failed to give such general indication. We, therefore, must consider the legal effect of the giving by appellant of this misleading information to bidders.
In United States v. Atlantic Dredging Company, 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920), the Supreme Court found in *1012 favor of a contractor's claim for excess cost of dredging due to conditions differing from those represented to exist. The government relied on various exculpatory provisions. There the court said:
"The specifications stated that the depth of the channel to be dredged was thirty five feet, and under the heading, `Quality or Character of the Material,' contained the following: `The material to be removed is believed to be mainly mud, or mud with an admixture of fine sand, except from Station 54 to Station 55 + 144, at the lower end of West Horseshoe Range (the latter is not included in the contract) where the material is firm mud, sand, and gravel or cobbles.' It was stated that  `bidders are expected to examine the work, however, and decide for themselves as to its character and to make their bids accordingly, as the United States does not guarantee the accuracy of this description.'
The further statement was that  `a number of test borings have been made in all of the areas where dredging is to be done under these specifications, and the result thereof may be seen by intending bidders on the maps on file in this office. `(See paragraph 17.) No guaranty is given as to the correctness of these borings in representing the character of the bottom over the entire vicinity in which they were taken, although the general information given thereby is believed to be trustworthy.'"
Finding that actual conditions were not as had been represented, the Supreme Court held that the contractor was entitled to damages flowing from his reliance on the representation and stated as follows:
"The case is ... within the ruling of United States v. Spearin, 248 U.S. 132, 136, where it is stated that the direction to contractors to visit the site and inform themselves of the actual conditions of a proposed undertaking will not relieve from defects in the plans and specifications, citing Christie v. United States, 237 U.S. 234, Hollerbach v. U.S., 233 U.S. 165, and United States v. Utah, Nevada & California Stage Co., 199 U.S. 414. It is held in those cases `that the contractor ought to be relieved, if he was misled by erroneous statements in the specifications.'"
In a somewhat similar case where the owner gave the contractor pre-bid information relating to soil moisture conditions, the Ohio Supreme Court in Condon-Cunningham, Inc. v. Day, 22 Ohio Misc. 71, 258 N.E.2d 264 (1969), stated as follows:
"The principal issue here is whether the contractors could rely upon information given to them and also other information made available to them concerning the moisture content of the soil found in the Kaiser-Nelson Cut. This information was gained through borings made by a Columbus engineer by the name of Jewell, who made these borings for and on behalf of Cuyahoga County in connection with this project.
.....
Plaintiff stated in evidence at the trial that they relied on this information in preparation of their bid; that when they actually encountered the material referred to it was found to be much too wet to be easily dried, and in its present condition could not be used as fill. There is no question that the material encountered had a higher moisture content than anticipated after studying the Soils-General Notes, Jewell Report and Soil Profiles, and that extra expense was required for proper excavation and embankment of the area in question."
As to disclaimer clauses in the contract, the Ohio court said as follows:
"While the defendant contends that because of the various disclaimers the contractors had no right to rely upon the information given as to the moisture content of the soil, it does seem that it is a strange procedure to furnish the contractors with such information, to invite them to seek more detailed information from the county and to give them extensive boring reports in 11 elaborate pamphlets, which the county invites them to inspect, and then to say because of some of our *1013 disclaimers you may not use any of this elaborate information that obviously was obtained by us at much expense and, if you do rely on it, you are doing so at your peril. [Citations omitted.]
* * * * * *
This is one more thought before passing this subject matter. What were the bidders to do? Was each bidder to run these tremendously expensive core boring tests not knowing whether or not he would get the contract? Under defendant's contention there would be practically no bidders. A bidder would be faced with this dilemma. Shall I bid on what is presented to be and run the risk of loss if the information is not correct or shall I run core boring tests at great expense, amounting to thousands of dollars, which expense I must bear on my own if I do not secure the contract?
The county, on the other hand, should know what soil they are dealing with in a project they have under consideration. The information, if gathered by the county, will be useful to the county no matter who gets the job. The county should be the logical one to make the tests or have them made and not the bidders who may or may not get the job.
If the county has elaborate tests made and makes its finding known to the bidders, the bidders should be able to rely on these tests in all justice and fair play."
Compare also State Road Department v. Houdaille Industries, Inc., 237 So.2d 270 (Fla. 1 DCA 1970).
In furnishing bidders with information as to the nature of the materials likely to be encountered in dredging to the required depth, appellant had a duty to furnish information which would not mislead prospective bidders and to not withhold from prospective bidders information that another dredging contractor, in an adjacent area, had encountered extensive rock in dredging to the depth required by appellee here. We find competent substantial evidence to support the final judgment.
AFFIRMED.
MASON, ERNEST E., Associate Judge, concurs.
BOYER, J., dissents.
BOYER, Judge, dissenting.
As stated by the majority, appellee had prior experience in the area. Further, it did not rely upon the information obtained from appellant, but made with two other prospective bidders, at least 10 other probings. The cases cited by the majority are not therefore, in my view, controlling. Upon the facts recited in the majority opinion, I would reverse.