**MARTIN K. EBY CONSTRUCTION CO., INC., Plaintiff,**

v.

**JACKSONVILLE TRANSPORTATION AUTHORITY, a body politic and corporate, Defendant.**

**No. 3:03–CV–41–J–32TEM.**

United States District Court,
M.D. Florida,
Jacksonville Division.

March 21, 2005.

Ronald G. Robey, Smith, Currie & Hancock, Atlanta, GA, for Plaintiff.

David M. Wells, Edward M. Whelan, McGuirewoods LLP, Jacksonville, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

CORRIGAN, District Judge.

This case involves a dispute between Martin K. Eby Construction Co., Inc. ("Eby"), and the Jacksonville Transportation Authority ("JTA") arising from Eby's construction of highways and bridges forming part of the new Wonderwood Connector in Jacksonville, Florida. Although Eby's end product won awards for smooth concrete, the construction project was anything but smooth, resulting in two separate multimillion dollar lawsuits by Eby against JTA.[1]

In this case, Eby seeks over $10 million in damages relating to the difficulty it had in accessing areas of the construction site located in and over water and marshes. Eby asserts that JTA misled bidders into believing that the areas could be accessed using relatively inexpensive and uncomplicated temporary dirt haul roads and working platforms. Eby asserts that JTA is liable under breach of contract, differing site conditions, constructability, and superior knowledge claims.

The Court conducted a nine-day bench trial[2] in December 2004 and heard closing

---

1. The other case is *Martin K. Eby Construction Co., Inc. v. Jacksonville Transportation Authority,* Case No. 3:04–cv–1234–J–32–MCR. It is at an early stage in litigation.

2. The parties contractually waived trial by jury.

arguments in January 2005. Having reviewed the pleadings, examined the evidence, observed the witnesses, read the parties' proposed findings and conclusions, and considered the arguments, the Court makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

## I. *Findings of Fact* [3]

### A. *The Parties*

JTA is an independent state agency that provides transportation services for Duval County, Florida. The services include highway and bridge design and construction.[4]

Eby is a Kansas-based private contractor that has been involved in many large and well-known public construction projects in its 68–year history. Although Eby has had experience with bridge construction, it is not known in the industry as a "marine contractor," i.e., a contractor specializing in projects that involve construction over water. During the relevant time period, Eby had a significant Florida presence.[5]

### B. *The Project*

In the 1990s, federal funds and bond proceeds were earmarked for Jacksonville's Wonderwood Connector, a four-phased project involving the design and construction of new highways and bridges. The four phases, in chronological order from the earliest to the latest start dates, were Wonderwood Connector Segment 2A ("Wonderwood 2A"), Wonderwood Connector Segment 2 ("Wonderwood 2"), Wonderwood Connector Segment 1 ("Wonderwood 1"), and Wonderwood Connector Segment 3 ("Wonderwood 3").

This case involves Eby's construction of Wonderwood 2. Wonderwood 2 consists of approximately 2.1 miles of recently constructed four-lane highways and bridges connecting Sandcastle Lane and Girvin Road. One bridge is approximately 1,400 feet long and spans Greenfield Creek. Another bridge is approximately 3,585 feet long and spans the Intracoastal Waterway and Pablo Creek.

JTA retained Sverdrup Civil, Inc. ("Jacobs–Sverdrup"),[6] to design Wonderwood 2. Theodore Finch, originally employed by Jacobs–Sverdrup, was designated as the "Engineer of Record." [7] JTA also relied on its general consultant, Reynolds, Smith & Hills, Inc. ("RS & H"), to provide advice on various engineering aspects of Wonderwood 2, and Reynolds, Smith & Hills CS ("RS & H CS") to provide advice on various construction aspects of Wonderwood 2. George Mayforth of RS & H CS, later

---

3. The Court has considered all of the evidence admitted at trial. The Court does not include in the findings of fact any evidence that it has rejected as unreliable or that it finds irrelevant.

4. JTA is organized under Florida law and has its principal place of business in Florida.

5. Eby is organized under Kansas law and has its principal place of business in Kansas.

6. At some point, Sverdrup was acquired by Jacobs Engineering, Inc. For ease of reference, the Court will collectively refer to the companies both before and after the acquisition as "Jacobs–Sverdrup."

7. "Engineer of Record" was defined in the *Florida Department of Transportation Standard Specifications for Road and Bridge Construction* (1999) as "The Professional Engineer or Engineering Firm registered in the State of Florida that develops the criteria and concept for the project, performs the analysis, and is responsible for the preparation of the Contract Documents...." (Ex. 23 at 4–5, § 1–1.) This definition was amended for Wonderwood 2 to simply name Mr. Finch as the "Engineer of Record." (Ex. 21 at I–2, Art. 1–3.)

replaced by Shane Rixom of RS & H CS, was designated as the "Engineer"[8] responsible for ensuring that Wonderwood 2 was constructed as designed.

## C. *The Planning*

JTA and Jacobs–Sverdrup spent many years planning Wonderwood 2. The planning included the development of progressive bridge development reports ("BDRs"). Both RS & H, as a general consultant, and the Florida Department of Transportation ("FDOT"), as a courtesy, reviewed the BDRs and provided JTA and Jacobs–Sverdrup with feedback based on their significant experience with large highway and bridge projects.

In addition to addressing design details for the permanent highways and bridges, the BDRs addressed how the contractor would access the portions of the highways and bridges to be built over water and marshes. An aerial photograph of the Wonderwood 2 area before construction showed the Intracoastal Waterway and Pablo Creek as wide bodies of water deep enough for boating (at least at high tide), separated by a small island, and surrounded by small tributaries and marshes. The only ground that appeared relatively "high and dry" was an old railroad embankment upon or over which the permanent structures were to be built.

Generally, contractors use either barges or "temporary access structures" to access construction sites that are inaccessible by other means. As evident from the name, temporary access structures are temporary and used solely by the contractor for construction access. They are removed after project completion and the land upon which they were placed is returned to its original or near-original condition. Because of their temporary nature and limited use, they usually are not the central focus of a construction project.

Temporary access structures can take many forms, including dirt embankments, trestles, Bailey bridges,[9] and any combination of these structures. The type of temporary access structure selected for a particular project depends on, among other factors, the availability of environmental permitting, the type and weight of the construction equipment, the manner in which the construction equipment will be used, the type and weight of the building materials for the permanent structure, when access will be needed for construction of the permanent structure, the foundation upon which the temporary access structure will be placed, and the expediency with which the project must be completed. Because many of these factors implicate the means and methods used by the contractor, the contractor usually is responsible for selecting and designing the temporary access structure. This is in contrast to the permanent structure which, unless contracted as a design-build project, usually is fully designed with exact plans and specifications for the contractor to follow, is not dependent on the contractor's means and methods, and is not constructed for the sole direct benefit of the contractor.

At all times during the planning stage, JTA and Jacobs–Sverdrup anticipated that the contractor eventually selected for construction would use barges to access the portions of Wonderwood 2 to be built over

---

**8.** "Engineer" was defined in the Wonderwood 2 contract documents as "The duly authorized representative of [JTA] responsible for the specifications and the observation of construction to determine whether the result complies with the plans and specifications,

acting directly or through an authorized assistant or other representative." (Ex. 21 at I–2, Art. 1–3.)

**9.** Bailey bridges are portable pre-engineered, ready-to-assemble bridges.

the Intracoastal Waterway. Witnesses familiar with the construction industry agreed that such marine-based construction is less efficient, more complicated, and more costly than land-based construction.[10] Nevertheless, barges were anticipated because of the navigability, width, and depth of the Intracoastal Waterway.

JTA and Jacobs–Sverdrup originally anticipated that the contractor likewise would use barges to access the portions of Wonderwood 2 to be built at Pablo Creek. At some point, however, they became concerned that the contractor would not be able to do so because Pablo Creek is too shallow at low-tide for barges to stay afloat or obtain access. Ultimately, they anticipated that the contractor would continue constructing temporary access structures from adjacent land, across Pablo Creek, and up to the Intracoastal Waterway.

During the planning stage, JTA and Jacobs–Sverdrup sought to obtain all necessary environmental permits for the Wonderwood Connector so that eventual construction would not be stymied in what can be a time consuming permitting process. In its review of the BDRs, FDOT noted that, in addition to other environmental permits, environmental permits would be needed for the Wonderwood 2 temporary access structures because of their potential impact on wetlands. FDOT informed JTA and Jacobs–Sverdrup that they would have to depict the temporary access structures to show the permitting agencies how and how much of the area would be impacted. FDOT noted that the widths of the temporary access structures would need to be consistent with the sizes of the cranes to be used by the contractor eventually selected for construction.

JTA and Jacobs–Sverdrup responded to FDOT with the size and types of cranes that they anticipated the contractor would need to use, along with their belief that the temporary access structures would need to be at least 25 feet wide and parallel to the centerline of construction for the length of Wonderwood 2. They also followed-up with JTA's environmental consultant, Dial Cordy and Associates, Inc. ("Dial Cordy"), asking Dial Cordy whether they would need to provide the permitting agencies with "completed drawings" depicting the temporary access structures, and whether they would need to specify the type of temporary access structures, "i.e. fill on geogrid,[11] work mats, or [temporary bridges]" in order to obtain the permits. (Ex. 185.)

In furtherance of the permitting process, Jacobs–Sverdrup developed drawings for the temporary access structures in the form of dirt embankments, known as haul roads, with dirt working platforms, known as "fingers," jutting therefrom. Jacobs–Sverdrup took a "worst case scenario" approach in developing the drawings, i.e., depicting dirt haul roads and fingers that would allow the largest reasonable area of impact, which in turn would give the contractor the greatest flexibility to construct whatever type and size of temporary access structure it wanted to use based on its construction means and methods. This flexibility would allow the contractor to construct smaller temporary access structures, trestle bridges, or other structures that would cause equal or less impact to

---

10. Eby played a video at trial that reflected the inefficiencies inherent in the use of barges. The video filmed a barge picking up concrete from a land-based site, delivering the concrete to another barge, going back to pick up more concrete from the land-based site, and so on.

11. Geogrid is a specialty material used in the construction industry to provide support for dirt structures.

the wetlands without having to submit additional permit applications.

The drawings showed the dirt haul roads and fingers formed by placing filter fabric [12] on top of existing water and marshland then placing fill on top of the filter fabric until the surface reached the desired grade. Mr. Finch testified that Jacobs–Sverdrup developed the drawings for permitting only, and denied that Jacobs–Sverdrup ever intended the drawings to be used as an actual design for the contractor to follow. Mr. Finch testified that, in fact, he did not anticipate that the contractor would actually end up selecting the dirt haul roads and fingers depicted in the drawings as the temporary access structure for Wonderwood 2.

Dial Cordy submitted the drawings and other information, including the anticipated crane sizes, to the permitting agencies in an application and subsequent response to a request for additional information. Dial Cordy explained that the contractor eventually selected for Wonderwood 2 construction would use barges and dirt haul roads with fingers. Dial Cordy offered more details through a portion of a letter from Civil Services, Inc. ("CSI"), a consultant that had conducted a geotechnical investigation for JTA.[13] The letter explained that the dirt haul roads and fingers would include geosynthetic material "used to reinforce embankments placed over soft soils." (Ex. 130.) The letter further indicated that "[d]ue to the unique nature of this type of construction, the Contractor shall negotiate with the geosynthetic supplier to provide technical instructions.... A geotextile filter of a type recommended by the designer of the geosynthetic system shall be placed under the geosynthetic reinforcement.... Settlement of the sub-

grade shall be anticipated at the site since some soft silt materials have been encountered in the area." (Ex. 130.) Despite the detail in the letter, Mr. Finch testified that the letter was "generic" in nature, and intended only to give the permitting agencies information about how and with what materials the dirt haul roads and fingers would be constructed so they could determine their potential environmental impact.

Upon their review of the drawings and information, the permitting agencies expressed concern over the potential environmental impact that the dirt haul roads and fingers presented. In response, JTA and Jacobs–Sverdrup investigated ways to reduce their sizes, which in turn would reduce their environmental impact. The investigation included an October 2000 meeting with representatives from JTA, Jacobs–Sverdrup, Dial Cordy, and Superior Construction, Co., Inc. ("Superior"). Superior was the contractor for the previously-started Wonderwood 2A. It was believed that Superior would have insight into how the dirt haul roads and fingers depicted in the drawings could be reduced in size without impacting construction.

Based on Superior's suggestions, JTA revised its permit and drawings to reduce the width and length of the fingers. Presumably satisfied with the revisions, the permitting agencies issued permits for dirt haul roads and fingers for Wonderwood 2, including dirt haul roads and fingers at Greenfield Creek and Pablo Creek.

In addition to comments relating to temporary access structure permitting, FDOT advised JTA and Jacobs–Sverdrup that they would need to include in the Wonderwood 2 plans the temporary access structure drawings that had been permitted.

12. Filter fabric is a specialty fabric used in the construction industry to separate existing ground from fill placed on top of the existing ground.

13. Geotechnical engineering is a "branch of civil engineering that deals with the earth as a construction material." (12/10/04 Brumund 7:14–15.)

FDOT cautioned JTA that it would need to specify responsibility for their design and cost. According to FDOT:

Clear bid notes need to be provided as to the method of payment for building the haul road and maintaining haul road through construction. All haul road cross sections shown in permits and plans should be shown to depict the outline of haul road only. The design of the haul road i.e. type of fill material, geogrids etc. is to be the sole responsibility of the Contractor based on the anticipated construction loads.

(Ex. 198.) At the heart of this case, as will be discussed in detail, was JTA's inclusion of the drawings in the plans available to bidders without an indication that they were included, not as a temporary access structure design, but only to reflect the area or "footprint" and type of temporary access structure that had been permitted.

### D. The Bidding

JTA's and Jacobs–Sverdrup's years of planning culminated in the issuance on January 8, 2001 of a "Notice to Contractors," which began a competitive bid process for Wonderwood 2 construction. The bid process lasted 44 days, which is shorter than average, but not out of the ordinary for projects of this magnitude. Interested contractors could view plans and specifications beginning on January 8, 2001, and could submit sealed bid packages accompanied by a bid bond until February 21, 2001.

Bidding was done in typical fashion for FDOT projects in that the bid package included a bid form listing specific bid items and corresponding unit prices, all of which would be tallied to come up with an overall bid total. The bid form listed "Temporary Structure" as a separate roadway bid item, labeled as bid item "2103–1." As a bid item, contractors were required to specify a unit price for the "Temporary Structure" which was to reflect a total of all costs for the "Temporary Structure," including costs for design, material, labor, installation, removal, and disposal.

Information relevant to the "Temporary Structure" bid item was contained in several documents available to bidders; specifically: (1) special provisions, (2) plans and standard specifications, (3) permits, (4) soil boring information, and (5) written questions and answers. Both the "Notice to Contractors" and the standard specifications informed contractors that they were expected to examine the documents, as well as the construction site, before submitting a bid package.

### 1. Special Provisions

Special provision 103 addressed the "Temporary Structure" bid item. Mr. Finch had prepared special provision 103 based on FDOT's suggestion that the contract documents should specify design and cost responsibility. Although Mr. Finch initially planned to draft a provision from scratch, he learned before doing so that FDOT's 2000 version of the *Standard Specifications for Road and Bridge Construction* contained a new provision relating to temporary access structures. Mr. Finch determined that the new provision was appropriate for Wonderwood 2, so he copied it verbatim and included it as special provision 103.

Special provision 103, entitled, "TEMPORARY WORK STRUCTURES," contains three sub-sections, including a "Scope of Work" sub-section. In the industry, a "scope of work" provision usually sets forth the work to be undertaken by the contractor. Special provision 103 states:

103–1.1 **Scope of Work:** Construct temporary work structures used solely to support construction equipment. Temporary structures include but are not limited to work bridges, elevated

platforms, fill embankments and rail systems. Items such as barges, mats, or items such as false work or scaffolding are not included in this Section. If a temporary structure type other than the structure type shown in the plans is chosen, assume responsibility for obtaining all necessary permit revisions and the Engineer's approval. Conform to any limitations contained in the plans and permits. Do not place embankment outside the limits shown in the plans. The cost of the embankment, placing, compaction, and removal will be included in the lump sum price for Temporary Work Structure.

**103–1.2 Materials:** Construct the temporary work structure using materials sufficient to handle the anticipated loads. *Assume responsibility for the design of the temporary structure.*

. . .

**103–2 Basis of Payment.**

**103–2.1 General:** The unit price for the temporary work structure will include all costs associated with *the design*, materials, labor, installation, removal and disposal of the structure.

(Ex. 60)(emphasis added). A dispute throughout the case has been whether special provision 103 is ambiguous. JTA contends that the phrase "Assume responsibility for the design of the temporary work structure" applies to the entire "TEMPORARY WORK STRUCTURES" special provision, making it clear that the contractor was responsible for design relating to the "Temporary Structure" bid item; Eby contends that it applies only to the **"Materials"** sub-section, indicating that the contractor was responsible only for design of

the component parts of the "Temporary Structure" bid item.

2. *Plans and Standard Specifications*

The plans contained numerous numbered plan sheets with drawings and notes setting forth details necessary to give the contractor a comprehensive idea of the contemplated structures and the dimensions therefore. Five plan sheets, numbered 11, 40, 41, 42, and 43, contained details about the "Temporary Structure" bid item.

Plan sheets 40, 41, 42 and 43 are each labeled, "(TEMPORARY STRUCTURE) ACCESS ROAD PLAN" and include the drawings prepared by Jacobs–Sverdrup as part of its effort to obtain environmental permitting during the planning phase. (Ex. 20.)

The drawing on plan sheet 40 shows Greenfield Creek from above with lines showing locations of transmission lines, existing rights-of-way, wetland lines, a dirt haul road, and fingers. Sheet pile[14] is shown along some of the borders of the dirt haul road. An inset labeled, "ACCESS ROAD TYPICAL SECTION" and "ACCESS ROAD TYPICAL SECTION WITH SHEET PILE," depicts cross sections of the dirt haul road. (Ex. 20.) The cross sections show temporary filter fabric placed on existing ground, with fill placed on top of the temporary filter fabric to form a 2 to 1 vertical slope.

The drawing on plan sheet 42 shows Pablo Creek from above with lines showing locations of transmission lines, existing rights-of-way, wetland lines, a dirt haul road, and fingers.[15] Sheet pile is drawn along some of the borders of the dirt haul road. Also drawn is an area of four cross

---

14. Sheet pile are flat pieces of material that can be driven into the ground or the bottom of a body of water and meshed or interlocked with tie rods and wales to form a bulkhead or vertical wall.

15. As it turns out, the location of the fingers on plan sheet 42 conflicted with the location of the massive piers for the permanent bridge. Some of the fingers were shown to be in the same location as some of the piers.

drain pipes [16] across the width of the dirt haul road. An inset depicts a cross section of the cross drain pipes with sheet pile on both sides. In the corner of plan sheet 42, next to the inset, is the notation: "CONTRACTOR TO BE RESPONSIBLE FOR SHEETPILE DESIGN BY P.E. SHOP DRAWINGS ARE REQUIRED." (Ex. 20.)

The drawings on plan sheets 41 and 43 contain less detail than plan sheets 40 and 42. They do not include inset drawings of cross sections of the dirt haul road and fingers or cross drain pipes.

Plan sheet 11, labeled, "SUMMARY OF QUANTITIES," sets forth "PAY ITEM NOTES," that conveyed information about the costs that should go into the contractor's estimate for various bid items. (Ex. 20.) One pay item note specified quantities for fill, filter fabric, sheet pile, and cross drain pipes for the dirt haul roads and fingers depicted in plan sheets 40 through 43:

2103–1 (TEMPORARY STRUCTURE) INCLUDES 65,545 M3 ⌀TEMPORARY FILL. 4–1200mm @ 40 MI EACH = 160 MI TEMPORARY CROSS DRAINS, 5380 M2 TEMPORARY SHEET PILING, 34,000 M2 TEMPORARY FILTER FABRIC, AND REMOVAL OF ITEMS LISTED ABOVE. TEMPORARY FILL IS EMBANKMENT IN PLACE WITH NO ALLOWANCE FOR SETTLEMENT OR SHRINKAGE.

(Ex. 20.) As expressly indicated, the 65,-545 M3 ± did not include allowance for settlement or shrinkage of the fill.

Another dispute throughout the case has been whether these plan sheets relating to the "Temporary Structure" bid item were akin to a design specification that the contractor had to follow with little discretion or a performance specification that afforded the contractor more leeway. Plan sheets 40 through 43 do not contain a notation that the drawings thereon are conceptual or preliminary, that they are not intended to be a design, or that they are included for the limited purpose of showing a footprint of the permitted area or the type of structure for which permitting had been obtained.[17] Mr. Finch believed that the plan sheets did not contain enough information to be a design specification, and that the contractor would understand from special provision 103 and industry custom that it had design responsibility for the "Temporary Structure" bid item. Several witnesses agreed, however, that when material quantities are listed on a plan sheet, like in plan sheet 11, it is more likely that a design specification, rather than a performance specification, is being provided to the contractor. Further, unlike the plan sheets relating to the "Temporary Structure" bid item, a Wonderwood 2 plan sheet for channel units specifically stated that the contractor was responsible for designing temporary shoring towers.[18]

16. Cross drain pipes were included in the drawings to show the permitting agencies that there would be an allowance for tidal flow and for marine life to pass from one side of the dirt haul road to the other.

17. Eby argued that, under Florida's general guidelines for engineer practice and responsibility, Jacobs–Sverdrup should have indicated on the plan sheet drawings that they were only preliminary or conceptual, or that Jacobs–Sverdrup was not intending to accept responsibility for any elements thereon. *See*

Fla. Admin. Code 61G15–30.003. The Court, however, finds that the general guidelines do not apply where, as here, the parties are in a contractual relationship. *See* Fla. Admin. Code 61G15–30.001.

18. At trial, Eby also compared plan sheets 40 through 43 with plan sheets from a separate highway project involving construction at State Route 312 ("SR 312"). The plan sheets for the SR 312 project provided the contractor with a design specification for temporary access structures in the form of a dirt haul

After the dispute between Eby and JTA arose, JTA modified the bid documents for Wonderwood 1 to omit cross-sectional drawings, dimensions, and quantities of fill, filter fabric, and sheet pile. It also added a plan sheet note stating: *"CONCEPT DRAWINGS FOR TEMPORARY CONST. ROAD, FINGERS AND DREDGING OPERATIONS ARE PRO-VIDED FOR INFORMATION ONLY AS A METHOD OF ACCESS FOR CON-STRUCTION WHICH IS ALLOWABLE UNDER THE ENVIRONMENTAL PERMIT. THE CONTRACTOR MAY USE ALTERNATE METHODS AS AP-PROVED BY THE OWNER AND THE PERMITTING AGENCIES. THE COST OF ALL LABOR, EQUIPMENT AND MATERIALS NECESSARY FOR THE DESIGN, CONSTRUCTION, MAINTE-NANCE AND REMOVAL OF THE TEMPORARY CONST. ROAD, ... SHALL BE INCLUDED UNDER THE PAY ITEM ...."* [19] (Ex. 461.)

### 3. Permits

The documents available to bidders included the permits that JTA and Jacobs–Sverdrup had obtained during the planning phase. The permits are lengthy and detailed. They include permits for the dirt haul roads and fingers and drawings there-of depicting the dirt haul roads, fingers, and areas of temporary wetland impact.

### 4. Soil Boring Information

The documents available to bidders included soil boring information that had been prepared by CSI, JTA's geotechnical consultant, during the planning phase. The soil boring information set forth blow counts [20] and classifications of soil that could be encountered in the Wonderwood 2 area, including in the areas at or near Greenfield Creek, Pablo Creek, and the Intracoastal Waterway.

The soil boring information accurately conveyed that there were areas of very soft soil, in some places going down to a depth of 45 feet, upon which a person would "sink." (12/10/04 Brumund 70:6.) Dr. William Brumund, a geotechnical engineer hired by Eby, described what some of the soil boring information conveyed:

> [T]he borings ... particularly in the areas of the marsh of the Intracoastal and Pablo Creek, if you look at those borings, it shows between the upper 40 to 60 feet of those soils are fairly weak ... they're high-water content.
>
> It's the kind of material that if you picked up these organic silts, clays, that they—they'd have the consistency that you could hold the soil and squeeze it

road and fingers. The SR 312 plan sheets were similar to the Wonderwood 2 plan sheets in that the SR 312 plan sheets included an inset with a cross section of the dirt haul road and fingers and quantities of materials. The SR 312 plan sheets were different from the Wonderwood 2 plan sheets in that they specified that geogrid was to be used, the amount of geogrid necessary, and the layered placement of the geogrid. They also included a notation that the dirt haul road was to be constructed of suitable materials to handle all construction loads.

**19.** JTA objected to this evidence based on Federal Rule of Evidence 407, which prohibits, as a matter of policy, the admission of evidence of subsequent remedial measures to prove negligence, culpable conduct, product defect, design defect, or need for a warning. It may be arguable whether Rule 407 applies in a commercial construction setting as opposed to a tort setting, even where breach of an implied warranty is alleged. Regardless, the Court finds this evidence only to be slightly probative.

**20.** An engineer who testified at trial explained the purpose of blow counts: "The range of blow counts define a range of shear strength. For example, a blow count of less than two simply means that the shear strength of the soil is less than 250 pounds per square foot." (12/13/04 Mattox 10:18–22.)

and it would squeeze out between your fingers more easily than toothpaste would.

(12/10/04 Brumund 36:22–25, 37:1–9.)

JTA qualified the soil boring information by stating in a standard specification that it did "not guarantee the details pertaining to borings, as shown on the plans, to be more than a general indication of the materials likely to be found adjacent to holes bored at the site of the work, approximately at the locations indicated." (Ex. 23 at 10, § 2–4.) The standard specification further stated that the contractor, "shall examine boring data, where available, and make his own interpretation of the subsoil investigations and other preliminary data, and shall base his bid on his own opinion of the conditions likely to be encountered." (Ex. 23 at 10, § 2–4.)

### 5. *Written Questions & Answers*

The "Notice to Contractors" advertised a pre-bid meeting on January 25, 2001 to answer any questions that prospective bidders had about Wonderwood 2 and the bidding process. Mr. Finch presented an overview of Wonderwood 2. The following is part of his discussion about how the contractor would be able to access the construction site:

> We have permitted temporary access roads. If you look at the plans included on sheets 40 through 43 this has been permitted. It's 50 meters wide with an approximate 50 foot top. The access road is located coming in from Girvin Road up to Greenfield Creek on the south side of the structure with fingers to the substructure units.... Barges across are a possibility. The same thing on the Intercoastal [sic] Waterway again

is an access road with fingers going out to the substructure units. On the Queens Harbor side coming out of the Intercoastal [sic], you've got sheet pile walls out there where you can load and off load a barge.... Coming in is a 15 meter top with fingers going out to the substructure unit, but you're going to be severely limited with access. You need to take that into consideration.

(Ex. 54.)

The meeting included a question and answer session. The following questions and answers relating to the "Temporary Structure" bid item were published and included as an addendum to the contract documents:

> 4. In the areas of the Temporary Access Road, what are the natural ground elevations? We need this information to compute the volume of fill required.
>
> Ans. On Sheets 14 and 15 of 17 in the Army Corps of Engineers permit in Appendix C we show cross sections for the Temporary Access Road fill. The Pay Item Note on sheet 11 of the Roadway Plans shows the estimated amount of fill required as 65,545 M3 of embankment compacted in place with no allowance for settlement or shrinkage.
>
> 5. In the areas of the Temporary Access Road, the typical section shows filter fabric to be laid down prior to placing the fill. What type of filter fabric is to be used?
>
> Ans. The type of filter fabric to be used under the Temporary Access Road is up to the Contractor. The filter fabric is for purposes of aiding the contractor in restoring the area back to its original cross section.[21]

---

21. Filter fabric usually is removed following a construction project if there has been little or no settlement of the soil. However, a contractor may leave filter fabric in the ground following a construction project if settlement is more significant. The contractor may have to obtain an environmental permit or authorization to do so. Eby, for example, left in place geogrids that had settled below the original marsh elevation.

\* \* \*

7. In all areas of marsh fill (Temporary and Permanent), how is the settlement of the fill going to be paid for? Our concern is that during the placing and compacting of the fill, some initial settlement will occur and that over the entire construction period further settlement will also occur. Recent jobs that have had roads built over marshland have been surcharged and monitored, with a bid item by the cubic meter (M3) to cover the quantity of settlement.

Ans. In the areas of the permanent fill across the marshland, settlement of the roadway embankment was evaluated considering an embankment height of 4.6 meters. The analysis assumed that the unsuitable surficial organic soils are removed and replaced with suitable sandy materials. Results of the settlement analysis indicate that the expected settlement of the subgrade soils under the embankment loading is approximately 15 cm (0.5 feet). The majority of the settlement is expected to take place rapidly during embankment construction. It is noted that the clay or silty layers encountered during the investigation in this area are overconsolidated and have minor contribution to the expected settlement. The embankment quantity shown in the bid documents is based on the roadway cross sections. No allowance for settlement is included. See response to Question 4 for the Temporary Access Road.

(Ex. 59.) What in retrospect is unfortunate, none of the bidders asked questions about design responsibility, about whether plan sheets 40 through 43 presented a design specification, or about whether soft soil reinforcement or modification was necessary for the "Temporary Structure" bid item. A dispute throughout the case was whether JTA's answers misled bidders into believing that there would be little or no settlement of the fill for the temporary access structures.

### E. *Eby's Bid*

Eby was very interested in being awarded the Wonderwood 2 construction contract. Eby managers believed that Eby was well-equipped to construct Wonderwood 2 because of Eby's involvement with other large construction projects, including a recently completed U.S. Army Corp of Engineers project in nearby Palm Valley. The Palm Valley project involved a similar bridge structure, but was different from Wonderwood 2 in that it could be constructed almost entirely from adjacent land that did not have similar soft soil issues.

Eby assigned an in-house team of experienced bid estimators, headed by Dave Erickson, to prepare its Wonderwood 2 bid. Eby's estimating process included site visits and a more extensive site investigation involving walking around, taking pictures, and digging holes to evaluate the soil. Mr. Erickson testified that the site investigation was done by "at least two people," not including himself. (12/08/04 Erickson 187:6–7.)

On January 31, 2001, Mr. Erickson wrote a letter to JTA asking for the bid time to be extended by at least one week, stating that postponement would benefit JTA by providing additional time for "[e]xtraordinary site investigation" and additional geotechnical evaluation. (Ex. 177.) JTA ended up extending the bid time by one week, from February 14, 2001 to February 21, 2001.

Although much of the Wonderwood 2 area is water and marshland consisting of soft soil apparent even to the untrained eye, nothing from the site visits or investigation led the Eby estimators to believe that access to the construction site could not be accomplished using the dirt haul

roads and fingers depicted in the plan sheets. In fact, Mr. Erickson testified that the estimators who returned from the initial site investigation were excited and "less tentative about the access to the project after visiting it than we were by looking at the plans and stuff and seeing all this waterway out there." (12/08/04 Erickson 81:8–11.)

Eby estimators did not retain a geotechnical expert to analyze the soil boring information because they felt it would have been a "needless expense." (12/08/04 Erickson 120:23.) Dr. Brumund testified that, in his opinion, a reasonably prudent bidder would review soil boring information but would not hire an expert to analyze it if the owner provided design specifications. He also testified that, in his opinion, it would be prudent, but the exception, for a contractor to hire a geotechnical expert to review soil boring information if the contractor did not have experience in reviewing such information and if the bid documents told the contractor to inspect the site.

There is a factual dispute as to whether the optimistic view of access held by Eby's estimators was based on their mistaken belief that Pablo Creek was just a small tributary (approximately 8–10 feet wide) and not the wide body of water that it actually is (approximately 600 feet wide). Carl Nelson, Eby senior vice president in charge of Florida operations at the time, testified that pictures of a small tributary were labeled as "Pablo Creek" and posted in a "war room" that the estimators had

set up for Wonderwood 2. Mr. Nelson further testified:

> What was depicted to me on bid day is that the estimating team drove out to the end of the roadway, which was on the old alignment from the railroad, and they drove as far as they could drive on the road, got out and walked a short distance to a body of water, which was eight to ten feet wide, a couple feet deep, and couldn't—they were not able to travel any further on the—on the old railroad right-of-way because of water and soft—soft soil conditions and other marsh-like conditions that prevented from traveling.

(Depo. 11/29/04 Nelson 12:11–21.)

> [D]uring the discussions, during the bidding process as it related to Pablo Creek, it was represented to me by Dave Erickson that Pablo Creek was eight to ten feet wide and only a couple feet deep and that it could easily be bridged over by pushing in a berm of dirt across the—the creek. That was—that interpretation or opinion by Mr. Erickson was contrary to what the contract documents or the bid documents at the time indicated, which indicated a much wider creek, which would have been key in the decision on whether Eby bid the project or not. Had Eby known or had I known that it was going to involve a lot more marine construction, Eby would not have bid that project.

(Depo. 11/29/04 Nelson 7:1–14.) [22]

Whether because of the mistaken belief that Pablo Creek was nothing more than a

---

**22.** Eby tried to impeach Mr. Nelson's testimony about Eby's mistaken belief that Pablo Creek was just a small tributary, arguing that he should not to be believed because he was involuntarily terminated from Eby, did not get along well with others while there, and suffers from depression and other health problems. The Court, however, finds Mr. Nelson's testimony to be credible. He had an honest demeanor; he offered some testimony actual-

ly favorable to Eby; he was thought to be an honest employee by Eby's president; and, most importantly, his testimony was supported by another witness who was not impeached, David Pupkiewitz. Mr. Pupkiewitz, an Eby business development director at bid time, testified that he overheard a pre-bid conversation between Mr. Erickson and Mr. Nelson in which Mr. Erickson indicated that Pablo Creek was not the large body of water

small tributary, or because the plan sheets did not specify that the drawings were included for the limited purpose of showing the permitted area and type of structure for which permits had been obtained, or because the plan sheets did not indicate that soft soil reinforcement and modification measures were required, or because special provision 103 did not state that the contractor had design responsibility in the "Scope of Work" subsection, or because of a combination of some or all of these circumstances, Eby continued to believe through most of the bid time that temporary access could be accomplished by constructing the dirt haul roads and fingers depicted in the plan sheet drawings. According to Mr. Erickson, Eby believed that it could use the existing railroad embankment for "major parts of the crossing, and that the access was—that it was sound and it would hold us up, and that as we had to get out to the other end, we had a good access point there to continue the embankment out." (12/08/04 Erickson 81:21–25.)

Eby first realized that the dirt haul roads and fingers might require more than what was depicted in the plan sheet drawings just one or two days before the bid deadline. Prompted by a phone call from a friend, Mr. Erickson reviewed quotes that had been sent to Eby from two outside vendors specializing in soil stabilization materials, Contech Construction Prod-

ucts, Inc. ("Contech"), and R.H. Moore & Associates, Inc. ("R.H. Moore").

Generally, Contech and R.H. Moore provide quotes to potential bidders, often unsolicited, in an effort to sell their products and services. Bidders are interested in their quotes because they employ or are associated with "specialty engineers" who know more about the properties of soil reinforcement materials, such as geogrid and geotextile,[23] than general geotechnical engineers. (12/16/04 Kelley 46:1.) Eby had "lots of business dealings with Contech, for years and years...." (12/08/04 Erickson 92:18–19.)

For Wonderwood 2, Contech and R.H. Moore provided quotes to most or all potential bidders for the "Temporary Access" bid item based on their review of the soil boring information and other contract documents. Both Contech and R.H. Moore advised Eby that the dirt haul roads and fingers depicted on the plan sheet drawings would require soil reinforcement measures in the form of geotextile or geogrids. Contech's quote included a design based on the geometry and soil boring information with calculation signed and sealed by a Florida professional engineer; multiple layers of Tensar®[24] geogrid for soft soil reinforcement; separation filter fabric in addition to the geogrids; a statement that on-going settlement was expected throughout construction; a design as-

---

indicated by the plan sheet drawings. The Court found Mr. Nelson to be more credible than David Sehlin, the only Eby estimator who specifically testified that he obtained aerial photographs of Wonderwood 2 during the bid phase that would have shown the actual size of Pablo Creek. Throughout much of his testimony, Mr. Sehlin could not recall more general details about the bidding process. Contrary to Eby's proposed findings of fact, Mr. Erickson did not testify that he actually looked at aerial photographs of Wonderwood 2, only that it would have been typical for Eby to be provided with such photographs.

23. Geotextile, like geogrid, is used in the construction industry to provide support for dirt structures. Geotextile and geogrid are manufactured in varying strengths and layered in soil in an engineered manner. Some tightly woven geotextile can serve the dual purpose of providing structural support and serving as a filter between existing ground and fill. Geogrid cannot serve this dual purpose because it is perforated.

24. Tensar Earth Technologies, Inc., manufactures geogrids and other specialty products under the Tensar® name.

sumption for a 250–ton crane to be placed over a double mat and positioned a minimum of 2 meters from the edge of the platform; a requirement that no more than one foot of fill be placed per day; and a waiting period of 15 to 20 days after completing the construction platform prior to placement of the crane.

R.H. Moore's quote was for "High–Strength Woven Geotextile Fabricated Panels Based on soil reports in bridge documents" and an engineering layout to be provided by Mirafi Construction Products ("Mirafi").[25] (Ex. 293.)

Contech's and R.H. Moore's price quotes were markedly different: Contech's quote was $26M2 per unit ($1,225,072.20) while R.H. Moore's quote was only $5.03M2 per unit ($171,020.00). Mr. Erickson testified that he was taken aback by the quotes because neither the plan sheet drawings nor the materials specified in plan sheet 11 included soft soil reinforcement in the form of geogrid or geotextile. Mr. Erickson described his reaction to the quotes and the resulting course of action by Eby:

> You know, obviously where is this coming from? There's nothing in the plans and specs that say this. So I said [to a Contech representative] come on in here tomorrow morning and we'll sit down and we'll talk about it.
>
> And he came into the office and laid out his work, within a day before the bid, explaining that we should be utilizing all the stuff that they're having, which amounted to millions of dollars, because he felt that's what was needed to make the project work.
>
> Well, we listened to what he said. We kind of—we listened to everything he had to say, asked him a few questions.

And then we excused him. We said, Thank you very much for coming, and we continued to talk amongst ourselves. And I recall that we moved in to the library that we had in our office there and we had quite an involved discussion about what we had to do and what we needed to do. . . .

(12/08/04 Erickson 93:4–12, 93:24–25, 94:1–6.)

In the meeting referenced by Mr. Erickson, on the eve of the bid deadline, Eby estimators discussed the concerns expressed by the vendors and whether to include the Contech or RH Moore quotes in their estimate for the "Temporary Access" unit price. Eby did not want to include costly quotes from vendors if their materials or services were unnecessary, but at the same time was concerned over the soft soil issues that they had raised. At trial, JTA's counsel asked Mr. Erickson why he did not seek clarification from JTA on temporary access and soil reinforcement issues before submitting Eby's bid. Mr. Erickson responded: "We certainly had an option to call them, but they wouldn't have answered or commented on that. I mean, that's just—in our industry that's just not done. . . . They would have said, Bid it like you see it. Common response to that problem." (12/08/04 Erickson 180:15–17, 180:20–21.)

Based on discussions at the meeting, Eby decided to increase its estimate for the "Temporary Access" bid item by using the R.H. Moore quote and by adding $125,000 for labor since the Mirafi® fabric in the R.H. Moore quote is difficult to install. Eby selected the R.H. Moore quote because it was less expensive and because an Eby estimator had good experience with Mirafi® fabric from another project involving construction over soft soils.[26]

---

**25.** Mirafi manufactures geosynthetic fabrics under the Mirafi® name. RH Moore distributes Mirafi® fabrics.

**26.** In its proposed findings of fact, Eby represented that it did not include the Contech quote because it was not per plans and specifications. The Court finds that Mr. Erickson's

Eby prepared two separate estimates for the "Temporary Structure" bid item but ultimately only used one. Eby labeled one as "Bid Item 110" and one as "Bid Item 111." Bid Item 110 was used for the bid package that Eby submitted. Bid Item 111 was prepared during the bid process but was not used.[27] Bid Item 110 and Bid Item 111 took different approaches to the "Temporary Structure" bid item.

Bid Item 111 determined how much the dirt haul roads and fingers would cost if Eby used the plan sheet drawings and specified materials. The difference between the fill listed in Bid Item 111 (130,007 cubic yards) and the fill listed in plan sheet 11 (65,545 cubic meters, which converts to 85,017 cubic yards) was the amount that Eby estimated for shrinkage and settlement since plant sheet 11 specifically stated that the 65,545 cubic meter amount did not account for shrinkage and settlement.

Bid Item 110 determined how much the dirt haul roads and fingers would cost if Eby made cost-saving changes to the plan sheet drawings and specified materials. One change involved "flipping" the location of the dirt haul road and fingers in the area of Greenfield Creek. JTA's drawings on plan sheet 40 showed the dirt haul road and fingers on the south side of Greenfield Creek. Eby believed a more cost-effective approach would be to build them on the north side where the old railroad embankment offered better and higher soil conditions that would require less fill.[28] Other changes involved changing the dimensions of some of the fingers and eliminating sheet pile in the area of Pablo Creek. JTA's drawing on plan sheet 42 showed sheet pile on the north side of Pablo Creek, but did not show an opposing line of sheet pile on the south side. Eby believed from this placement that JTA intended the sheet pile to serve only for erosion control and not for structural support. Eby believed that it could use rip-rap[29] for erosion control and thereby eliminate the need for more costly sheet pile. Eby believed that JTA would approve these changes.

The different approaches in Bid Item 110 and Bid Item 111 were reflected in their cost estimates. Bid Item 110 estimated a total cost of $1,460,000 for temporary access structures; while Bid Item 111 estimated a total cost of $2,290,973 for temporary access structures. Bid Item 110 estimated that 30,845 cubic yards of fill would be needed for the area east of the

testimony does not support such a finding. Mr. Erickson testified only that he was aware that Contech had problems with geometry and needed more space, such that the environmental permit "might" have been impacted. (12/08/04 Erickson 94:17–23.) Mr. Erickson further testified that Eby would have assessed any vendor quote, even one outside plans and specifications, and would not have "just thrown it away saying it was flippant." (12/08/04 Erickson 95:15–16.)

27. None of the Eby estimators called to testify, including Mr. Sehlin, the estimator whose initials appear on Bid Item 111, offered detailed information about Bid Item 111. Mr. DuBois agreed that "nobody at Eby wants to take responsibility for that document." (12/15/04 DuBois at 48:2–4.) Mr. Sehlin tes-

tified that Bid Item 111 could have been prepared after the bidding process. The Court finds that Mr. Sehlin's testimony in this regard is not credible. He was effectively impeached by his earlier deposition in which he testified that Bid Item 111 was prepared during the bidding process. Further, his explanation at trial as to why Eby would have prepared Bid Item 111 after the bidding process was not believable.

28. Eby determined that JTA probably showed the dirt haul road and fingers on the south side in the erroneous belief that a transmission line on the north side posed a regulatory concern.

29. Rip-rap is a dense pile of rock or stone used to prevent soil erosion and runoff.

Intracoastal Waterway; while Bid Item 111 estimated that 84,530 cubic yards would be needed for the same area. Bid Item 110 estimated that it would take only twenty days to cross Pablo Creek; while Bid Item 111 estimated that it would take 180 days to construct a dirt haul road and fingers with sheet pile across Pablo Creek.[30]

Eby estimators did not give specific reasons for not using Bid Item 111, but one can reasonably assume that it was not used because it reflected a higher estimate that might prevent Eby from being the lowest bidder and because Eby thought it could successfully build the dirt haul roads and fingers for the amount listed in Bid Item 110.

### F. Superior's Bid

The only detailed evidence offered by either party about the efforts of other bidders related to Superior, the contractor for the previously-started Wonderwood 2A. Superior's Wonderwood 2 bid ended up being only slightly (1.2%) higher than Eby's bid. JTA called Peter Kelley, the vice president of Superior's Florida operations, to testify about how Superior approached the Wonderwood 2 bidding process and, in particular, the "Temporary Access" bid item and its corresponding unit price.

According to Mr. Kelley, Superior had been "extremely interested in and extremely aggressive on" the Wonderwood 2 bid because of its work on Wonderwood 2A and the availability of its crews and equipment in the area. (12/16/04 Kelley 20:4–5.) This aggressiveness led Superior to take bidding risks that it ordinarily would not take.

In preparing its bid, Superior did an extensive site investigation of Wonderwood 2, including flying over the area in a helicopter, conducting surveys to determine the amount of fill needed for dirt haul roads and fingers, and evaluating the soil boring information. Superior did not rely solely on its experience with Wonderwood 2A because it believed that Wonderwood 2 presented different conditions.

Superior estimators believed from their reading of special provision 103 and industry practice that the Wonderwood 2 contractor would be responsible for choosing, designing, and constructing temporary access structures. Superior viewed the plan sheet drawings not as designs but as an indication of the permitted area and the type of temporary access structure allowed by the permitting agencies.

From their own site investigations and conversations with representatives from Contech, RH Moore, and other vendors, Superior determined that the soils at the construction site were "weak and extremely marginal" and that there would be significant settlement of any dirt placed thereon. (12/16/04 Kelley 27:6–7.) According to Mr. Kelley, the vendors had "expressed concern about the soils and what it was going to take to adequately support the equipment out there, and that there would be, you know, some form of reinforcement required." (12/16/04 Kelley 42:25, 43:1–3.) Superior was not misled into believing otherwise based on the plan sheet drawings, listed materials, or any of the pre-bid questions and answers.

Superior concluded that the "Temporary Access" bid item was the riskiest part of the Wonderwood 2 bid because of the soft soil conditions and Superior's understanding that it would be responsible for choosing and designing the type of temporary access structures to be used for construction. The bid item was made more risky

---

**30.** The time and fill differences in Bid Item 110 and Bid Item 111 also support Mr. Nelson's testimony that Eby estimators believed that Pablo Creek was just a small tributary.

by the fact that, at the time of submitting its bid, Superior had not decided exactly what type of temporary access structure it would use for all areas of Wonderwood 2. It had determined only that in some areas it would use dirt haul roads and fingers with soil reinforcement. It also had considered a dirt haul road and fingers at Pablo Creek, but with trestle bridges instead of cross drain pipes because it believed that cross drain pipes would fail under the weight of heavy construction equipment.

Without knowing exactly how it would proceed if awarded the bid and with the understanding that it was taking a risk with the "Temporary Structure" bid item, Superior came up with an estimated cost of $1,034,837 for the "Temporary Structure" bid item, but inserted a unit price of $1,658,000 to account for the risk, markup, or indirect costs. These figures included estimated costs for geogrid purchased from Contech, sheet pile, and approximately 70,000 cubic yards of fill (almost twice what Eby estimated in Bid Item 110). Mr. Kelley opined from his review of the contract documents and industry experience that if Superior had been awarded the contract and temporary access proved to be more expensive than it had estimated because of the design Superior had chosen or the way in which it proceeded with construction, Superior would be responsible for any additional cost.

Superior did not consider using barges for construction at Pablo Creek because it did not think that barges were an option. Superior thought that if they had been an option, JTA would have obtained permits to dredge and use barges rather than permits to construct dirt haul roads and fingers. Mr. Kelley opined that the use of barges at Pablo Creek, as opposed to dirt haul roads and fingers, would have in-

creased the overall construction cost by an amount between $500,000 to $1,000,000 because of the inefficiencies, difficulties, and increased costs inherent in marine-based construction. Mr. Kelley explained that, despite the higher cost, Superior would have liked the option to use barges for construction at Pablo Creek because it would have taken some of the risk out of estimating the "Temporary Structure" unit price.

### G. *The Bids and JTA's Estimate*

Seven contractors, including Eby and Superior, submitted timely bids to JTA. The bid totals ranged from Eby's low of $36,887,852.12 to GLF Construction Corporation's (GLF's) high of $49,975,237.15. The unit prices for the "Temporary Structure" bid item ranged from Eby's low of $1,460,000 to GLF's high of $4,000,000.

Once the sealed bids were opened and tabulated, JTA disclosed an estimate that had been prepared by Jacobs–Sverdrup and RS & H during the planning phase. The estimated total was $40,277,186.31, or $3,389,334.19 more than Eby's bid total. The estimated unit price for the "Temporary Structure" bid item was $517,425, or $942,575 less than Eby's unit price.

Although Mr. Finch was involved in preparing and reviewing the overall estimate, he could not recall who had prepared the estimate for the "Temporary Structure" bid item, or on what information it was based, but believed that he had assigned the task to one of his younger engineers. Mr. Finch posited that the estimate could have been based on materials alone without accounting for design costs. Mr. Finch indicated that design costs usually would not be included in a temporary access bid item because they typically would be very minor relative to the materials cost.[31]

---

**31.** JTA had prepared other estimates based on different types of permanent structures, in-

cluding a permanent trestle bridge. One esti-

No one who testified knew exactly why there was such a wide range of estimates (from $517,425 to $4,000,000) for the "Temporary Structure" bid item, though Mr. Finch presented a logical explanation that the estimators use widely varying programs and methods to come up with estimates, and may have considered creative approaches to the "Temporary Access" bid item, from the use of barges to the use of pre-owned Bailey bridges. Eby, which determined cost-effective changes to the dirt haul roads and fingers depicted in the plan sheet drawings (flipping the dirt haul road from the south side to the north side of Greenfield Creek, replacing sheet pile with rip rap at Pablo Creek, and changing the dimensions of some of the fingers in other areas), is a good example of a contractor that used an alternative approach resulting in a decrease in its estimate amount.

### H. *The Bid Award to Eby*

JTA awarded the Wonderwood 2 contract to Eby as the lowest qualified bidder. The contract was for a fixed price of $36,887,852.12. Eby's estimating team was "ecstatic" and felt good about their estimate, particularly since their bid total was only slightly lower than Superior's bid total. They presumed that Superior's bid total reflected a thoughtful estimate based on relevant experience since Superior had been constructing Wonderwood 2A and had been involved in previous FDOT and JTA highway and bridge projects.

Eby assigned Mr. Erickson to be the project manager. Although he had never been a project manager for Eby prior to Wonderwood 2, he had many years of operational experience in the construction industry and specific knowledge about Wonderwood 2 that he had gained from his role in preparing Eby's bid.

### I. *The Contract Documents*

JTA and Eby entered into a written agreement in April 2001. Mr. Nelson signed the written agreement on behalf of Eby. As earlier discussed, several contract documents, many quite lengthy, governed the parties' relationship. The contract documents included the contract itself, the special provisions, the plans and standard specifications,[32] and the permits. The parties rely on several different provisions of the contract documents to assert their respective positions.

#### 1. *Differing Site Conditions Provision*

Standard specification 4–3.7 is a differing site conditions provision typical of ones found in most public works contracts. Its purpose is to discourage bidders from increasing bids to account for unexpected conditions by assuring them that increased costs resulting therefrom will be reimbursed. The result is a lowering of bids and concomitant cost savings to the governmental owner. Standard specification 4–3.7 provides:

> Differing Site Conditions. During the progress of the work, if subsurface or latent physical conditions are encountered at the site differing materially from those indicated in the Contract, or if unknown physical conditions of an un-

---

mate was for $35,320,087. This estimate included a line item estimate of $5,612,515 for "Haul Rd. & Embankment." (Ex. 182.) Another estimate was for $37,414,882. This estimate included a line item estimate of $7,707,310 for "Haul Rd & Trestle Approach." (Ex. 183.) The testimony did not make clear whether these estimates were dependent on the type of permanent structure

contemplated or whether these estimates included permanent structure costs.

**32.** The standard specifications incorporated by reference the *Florida Department of Transportation Standard Specifications for Road and Bridge Construction* (1999), a 798–page manual published and used by FDOT for its highway and bridge projects.

usual nature differing materially from those ordinarily encountered and generally recognized as inherent in the work provided for in the Contract are encountered at the site, the party discovering such conditions shall promptly notify the other party in writing of the specific differing conditions before the Contractor disturbs the conditions or performs the affected work.

Upon receipt of written notification of differing site conditions from the Contractor, the Engineer will investigate the conditions, and if it is determined that the conditions materially differ and cause an increase or decrease in the cost or time required for the performance of any work under the Contract, an adjustment will be made . . . .

(Ex. 56 at I–8, § 4–3.7.)

### 2. *Quantities Provision*

Standard specifications 2–3 and 9–3 are typical quantities provisions. Similar to the differing site provision, their purpose is to prevent bidders from increasing bids to account for unexpected material variations by assuring bidders that increased costs resulting therefrom will be reimbursed. Standard specification 2–3 provides:

**2.3 Interpretation of Estimated Quantities.**

For those items constructed within authorized plan limits or dimensions, use the quantities shown in the plans and in the proposal form as the basis of the bid. The Department will also use these quantities for final payment as limited by the provisions for the individual items. For those items having variable final pay quantities that are dependent on actual field conditions, use and measurement, the quantities shown in the plans and in the proposal form are approximate and provide only a basis for calculating the bid upon which the Department will award the Contract.

Where items are listed for payment as lump sum units and the plans show estimates of component quantities, the Department is responsible for the accuracy of those quantities limited to the provisions of 9–3.3. Where items are listed for payment as lump sum units and the plans do not show estimates of component quantities, the Contractor is solely responsible for his own estimates of such quantities.

The Department may increase, decrease, or omit the estimated quantities of work to be done or materials to be furnished.

(Ex. 23 at 10, § 2–3.) Standard specification 9–3.3, referenced in standard specification 2–3, provides:

**9–3.3 Lump Sum Quantities:**

*9–3.3.1 Error in Plan Quantity.* Where the Department designates the pay quantity for an item to be a lump sum and the plans show an estimated plan quantity, the Department will adjust the lump sum compensation only in the event that either the Contractor submits satisfactory evidence or the Department determines and furnishes satisfactory evidence that the plan quantity shown is substantially in error as defined in 9–3.2.1.

*9–3.3.2 Authorized changes in Work:* Where the Department designates the pay quantity for an item to be a lump sum and the plans show an estimated plan quantity, the Department will adjust compensation for that item proportionately when a plan change results in a significant increase or decrease in the quantity from the estimated plan quantity. When the plans do not show an estimated plan quantity or the applicable specifications do not provide adjustments for contingencies, the Department will compensate for any authorized plan change resulting in a significant increase or decrease in the cost of acceptably

completing the item by establishing a new unit price through a supplemental agreement as provided in 4–3.2.3.

(Ex. 23 at 75, § 9–3.3.)

### 3. *Order of Precedence Provision*

Article 5–2, entitled, **"Coordination of Contract Documents,"** seeks to account for any discrepancies in the numerous contract documents. (Ex. 21 at I14, Art. 5–2.) Article 5–2 sets forth an order of precedence under which the special provisions control any discrepancy with other contract documents, including the plans and standard specifications.[33]

### 4. *Claim Notice, Documentation, and Amendment Provisions*

Special provision 5–12 specifies conditions that must be followed for Eby to bring a claim against JTA; specifically, notice, record-keeping, and content requirements. Special provision 5–12.2 required Eby to give JTA advance written notice before beginning any work that Eby deemed to be outside the scope of the contract documents. If Eby failed to do so, it would be deemed to have waived any claim for additional compensation or time relating to the work. Special provision 5–12.7 required Eby to keep daily records of all labor, material, and equipment costs relating to any work that Eby deemed to be outside the scope of the contract documents and to provide the records to JTA. Special provision 5–12.3 required Eby to provide certain information with any claim for additional compensation or time. It also prohibited Eby from amending either its bases for entitlement or amount of compensation or time asserted in its claim.

### J. *Eby's Plans to Proceed*

On March 14, 2001, after submitting the winning bid but months before construction actually began, Eby held an internal bid review meeting to transfer information from its estimating team to its construction team. In meetings of this type, Eby uses a computer-generated form listing standard subject headings and checklists thereunder to ensure that all relevant information is transferred. Subject headings include, **"PROJECT PRINCIPALS . . .," "CONTRACT," "PLANS AND SPECIFICATIONS," "ANYTHING UNUSUAL OR SPECIAL," "GEOGRAPHIC LOCATION," "SCHEDULE,"** and **"POSSIBLE PROBLEMS IN THE ESTIMATE."** (Ex. 53.)

Different aspects of access to the construction site were discussed by the Eby estimating and construction teams as reflected by notations under these headings on the form created for Wonderwood 2. Eby did not call a witness to identify who wrote the notations, but Mr. Erickson testified that they could have been written in advance of the bid review meeting or as a result of discussions between the estimating and construction teams at the meeting.

Under the subject heading, **"PROJECT PRINCIPALS . . .,"** was a checklist item entitled, "Any basic feelings the Estimators have developed during the bid time," and a sub-item entitled, "good," next to which Eby wrote, "Access is key to job." (Ex. 53.)

Under the subject heading, **"GEOGRAPHIC LOCATION"** was a checklist item entitled, *"Possible Differing Site Conditions"* and sub-items entitled, "Why?" and "What areas?" next to which Eby wrote: "Possible problem with plan

---

**33.** The contractual order of precedence may have conflicted with what Larry Wehner, the JTA project manager for Wonderwood 2, actually had wanted or intended as the order of precedence. However, the Court concludes that the order of precedence stated in the contract is unambiguous, making Mr. Wehner's intent irrelevant.

design of temp. access" and "Platform 'soft' ground may cause it to fail. *Need to be careful: Can't expect them to take responsibility for their design in one area, then not use their alignment in another area without a credit." (Ex. 53.)

Mr. Erickson testified that Eby inserted the notation: "Platform 'soft' ground may cause it to fail," because of the Contech and RH Moore quotes indicating soft soil issues and the need for soil reinforcement measures. According to Mr. Erickson, the estimating team wanted to make the construction team aware of the problems "so that we didn't just go out there and do something foolish, like drop a crane into the marsh. So we made them aware that further investigation was necessary to make sure that we had a safe work plan." (12/08/04 Erickson 109:10–14.)

Mr. Erickson further testified that Eby inserted the notation stating, "Need to be careful: Can't expect them to take responsibility for their design in one area, then not use their alignment in another area without a credit," to alert the construction team that if they expected a cost adjustment in their favor for the dirt haul roads and fingers in some areas where reinforcement would be needed, they would have to expect a cost adjustment in JTA's favor relating to Eby's cost-saving plans to flip the dirt haul road from the south side to the north side of Greenfield Creek, replace sheet pile with rip rap at Pablo Creek, and change the dimensions of some of the fingers in other areas.

On April 24, 2001, Eby and JTA participated in a pre-construction conference. JTA's agenda for the conference requested that Eby identify any errors or omissions in the plans or any differing site conditions. Eby did not identify any issues relating to dirt haul roads and fingers even though it had discussed such issues at its earlier internal bid review meeting. JTA points out that standard specification 5–4

directs that the contractor "not take advantage of any apparent error or omission discovered in the Contract Documents, but immediately notify the Engineer of such discovery. The Engineer will then make such corrections and interpretations as necessary to reflect the actual spirit and intent of the Contract Documents." (Ex. 23 at 28, § 5–4.)

On May 3, 2001, JTA gave Eby a "Notice to Proceed" with construction, which initiated Eby's mobilization for Wonderwood 2 construction. The contract called for the project to be completed in 915 calendar days, which included 90 days of anticipated weather delay. Superior believed that, if it had been awarded the bid, it would have needed all 915 calendar days to complete the project, even on an aggressive construction schedule. Eby, however, optimistically anticipated that it could complete the project in just 727 calendar days, which included 124 days of anticipated weather delay and 188 days of "float" time.

### K. The Problems

On May 16, 2001, as one of its first actions, Eby submitted to Mr. Mayforth a request to flip the temporary access road from the south side to the north side of Greenfield Creek. Mr. Mayforth approved the request as Eby had expected.

Eby's access problems began almost immediately. As site clearing progressed during May 2001, Eby's concerns about soft soil in the areas where it planned to construct the dirt haul roads and fingers grew when equipment used by its site clearing subcontractor became unstable and mired in soft soil. Eby's president, Richard Bean, described his site visit:

[The soft soil conditions were] becoming a significant concern. As the clearing was taking place, the footing for, I guess, men and equipment when you get

off of the railroad right-of-way and get out into the adjacent areas.

. . .

Well, I saw a lot of water, marsh conditions. Our team was just in the process of trying to start construction in that. They were having a lot of difficulty with stability for equipment and—equipment and people.

(12/07/04 Bean 37:16–19, 37:24–25, 38:1–2.)

Eby determined that, to proceed with construction in a safe and exigent manner, it needed to elicit expert help to design dirt haul roads and fingers that could effectively support its crews and heavy equipment. Given the soft soil conditions it was encountering, Eby believed it would be too risky to attempt to construct the dirt haul roads and fingers using the plan sheet drawings and the engineered layers of Mirafi® fabric that it had included in its bid.[34]

Eby first considered staging logs in a particular pattern based on an old U.S. Army Corps of Engineers method. Eby went so far as to begin sawing timber at the site and to engage an engineer to provide a design. However, according to Mr. Erickson, "[n]obody seemed to be familiar" with this method, and his supervisor believed that the problem was too big for that method. (12/08/04 Erickson 113:9.)

Sometime in May 2001, Eby contacted Synergy Earth Systems, Inc. ("Synergy"), an expert in the area of soft soil reinforcement, to provide advice on how to proceed. Eby also met with a RH Moore project coordinator and a Mirafi engineer to discuss the quote that RH Moore had provided to Eby and other bidders during the bidding process. Eby told them it needed signed and sealed engineering documents for the dirt haul roads and fingers, and

that Eby was going to hire an independent engineer to further analyze what was required. In late May 2001, following these discussions, RH Moore provided Eby with a revised quote of $5.60M[2] ($190,400.00), which included an estimated cost for signed and sealed engineering documents.

In early June 2001, Eby representatives met on-site with Synergy's president, Robert Mattox. From that point forward, Mr. Mattox took control over the approach Eby would take with respect to the dirt haul roads and fingers. On June 15, 2001, Mr. Erickson sent Synergy a letter stating that Eby had received Synergy's sketches and "quotation to provide the engineering services, geotextile and geogrid materials, and onsite supervision of installation for the West abutment area of Greenfield's Creek portion of the temporary structure in the amount of $35,415.00" and notifying Synergy of Eby's intent to award it a subcontract. (Doc. 287).

At the same time that Eby was consulting with Synergy, it was preparing a claim against JTA. On June 18, 2001, Mr. Erickson asked Mr. Mattox to review a draft letter to JTA and "comment, edit, enhance (you get the picture) it from an engineering perspective" to "justify additional compensation for any geotechnical improvements to the plan temporary embankments." (Ex. 817.) On June 22, 2001, after receiving Mr. Mattox's comments, Mr. Erickson sent Mr. Mayforth a letter stating:

Our preparation for the installation of the access road detailed on [plan sheet 40] . . . has exposed an unanticipated constructability issue. Preliminary engineering calculations regarding the construction of the temporary working platform in the marshes indicate that severe mudwaving will occur in the marsh un-

---

**34.** Eby's own expert, Dr. Brumund, testified that the Mirafi® material could have been incorporated into a design for the dirt haul roads and fingers.

less geosynthetic reinforcement and special construction techniques are used. This mudwaving will cause disturbance of the marsh to extend a significant distance beyond the permitted footprint of the temporary working platform. Further, our preliminary evaluations also show that the marsh is incapable of supporting the necessary construction equipment unless geosynthetic reinforcement and other soft soil modification techniques are used. We believe that any installation of geosynthetic reinforcement or soft soil modification in conjunction with access road construction over marsh areas is outside the contract scope of work and wish to advise you we will be seeking an equitable adjustment to our contract to cover the added costs.

We are surprised that no information regarding protection for uneven settlement or criteria given for instability issues regarding embankment were incorporated into the construction documents. We believe that awareness of instability issues and adequate solutions should have been incorporated within the contract documents.

The contract documents do not indicate in Section 103 that geosynthetic treatment or soft soil modification is included in the scope of work. Details on [plan sheet 40] ... further enhances the project requirements and notes the necessity of filter fabric and sheetpile but omits

any mention of geosynthetic treatment, soft soil modification, or uneven settlements.

(Ex. 62.)

On June 27, 2001, Eby and Synergy executed a contract that required Synergy to design the dirt haul roads and fingers within the permitted area indicated in the plan sheet drawings, taking into consideration the construction equipment that Eby would be using and when Eby would need access. As the work progressed eastward, Eby and Synergy amended their agreement to account for additional services. Ultimately, Eby paid Synergy $927,442.

On July 3, 2001, representatives from JTA, Eby, RS & H CS, Jacobs–Sverdrup, Synergy, and other firms held a special meeting to discuss the issues expressed in Mr. Erickson's June 22, 2001 letter. Mr. Mattox explained Synergy's approach under which multiple layers of Tensar® geogrid would be used to provide soil reinforcement, numerous "wick drains" [35] would be used to allow water from the soft soils to percolate up through the soil and lead to expedited soil consolidation, and surcharge embankment [36] would be used to compress and stabilize the road.[37]

The parties agreed that Synergy's approach was "a practical solution." (Ex. 73.) However, they deferred the issue of "the responsibility of the costs associated with the engineering material acquisition, and work to perform the construction of

35. "Wick drains" are prefabricated geotextiles wrapped around a drainage core. They are vertically inserted into the ground at a desired depth then anchored to prevent their movement.

36. "Surcharge embankment" is "additional dirt filled on top of the temporary access structure that acts as additional weight...." (12/07/04 Bean 40:22–25.)

37. In its proposed findings of fact and conclusions of law, JTA emphasizes that the Ten-

sar® geogrid in Synergy's approach was the same geogrid that Contech had recommended to Eby during the bid process, and serves the same structural support purpose as the high strength Mirafi® fabric that R.H. Moore had recommended to Eby in its quotes during and after the bid process. JTA also emphasizes that Eby did not disclose to JTA, either in the June 22, 2001 letter or the July 3, 2001 meeting, that it had received information from Contech and R.H. Moore during the bid process or that it had estimated the cost of soil reinforcement in formulating its unit price.

the temporary work platforms." (Ex. 73.) They agreed that, in the meantime, Eby would identify any costs that it deemed extra using a force account method.

On July 11, 2001, representatives from JTA, Eby, RS & H CS, Jacobs–Sverdrup, Synergy, and other firms held another special meeting, this time to discuss the previously-deferred responsibility issue. JTA set forth its position through Mr. Finch, who explained the genesis of special provision 103 and emphasized its payment subsection providing that the unit price for temporary work structures included all costs associated with the design, materials, labor, installation, removal and disposal of the structure. Mr. Finch indicated that:

> It was not [my] intent to dictate the Contractor's means and methods. The intent of the drawings was to provide the Contractor with a permitted corridor using a worst case impact to the salt marsh. If the Contractor determined to use some other means of construction access he could within the general limits of the plans and permits. [I] believed this was adequately described in the 103 provision, plan details, as well as plan notes and that it should be included under this pay item.
>
> . . .
>
> [The] unit price in the engineer's estimate was determined based on the quantities in the pay item notes. [I] understood the effort to be great as described in the contract documents and since [I] had no expertise in bidding, input a number which included mostly material costs. . . . [I] expected enhancement of the subsoils to be a part of the design analysis of the temporary access.

(Ex. 75.) Eby set forth its position through Mr. Erickson and a letter dated the same day. Mr. Erickson stated:

> Eby believed the approach of having the access road and finger added as a pay item was not typical procedure with the FDOT. . . . Eby does not view the design effort as incidental to the construction of the platform since its pay item is a part of the contract. . . . Eby understood the work associated with the platform to include only that effort from the existing ground upward. . . . [Eby] would entertain sharing the specific bid information for the [temporary access structures] pay item if [JTA] agreed that [Eby] was due compensation.

(Ex. 75.) Mr. Erickson cited in his letter the specific contract document provisions under which Eby would be making a claim against JTA. The parties did not reach an agreement on responsibility at the July 11, 2001 meeting. Instead, JTA asked Eby to provide additional details and rationale for why it would be entitled to more time and money.

Eby proceeded with construction of the dirt haul roads and fingers using Synergy's approach even without an agreement on responsibility so that its aggressive construction schedule would not be impacted. As it had agreed to do, Eby maintained force account records of the equipment and labor it was claiming to be extra and provided those records to JTA. Eby responded to JTA's request for more details and rationale in an August 14, 2001 letter that reiterated the position Eby took in Mr. Erickson's June 22, 2001 letter and the July 11, 2001 meeting. JTA did not send Eby an immediate written response.

In September 2001, having still not resolved responsibility for costs relating to the dirt haul roads and fingers that Eby claimed were extra, Eby turned to the question of how it would access construction yet to be performed at Pablo Creek. Eby contacted Metz & Associates, Inc. ("Metz"), a company with structural engineers specializing in bridge design, to determine the cost and feasibility of constructing dirt haul roads and fingers

across Pablo Creek. Metz's preliminary assessment indicated that such construction would require very long sheet pile, which would be expensive and would take a long time to install. Eby did not pursue a more detailed assessment from Metz.

Eby also obtained an estimate from Synergy. Mr. Mattox indicated that he would have loved to have worked on Pablo Creek. He estimated that material and design to construct dirt haul roads and fingers across Pablo Creek would cost roughly $200,000. This amount did not include "labor or a lot of other things that would be associated with that construction." (12/13/04 Mattox 27:19–21.) Mr. Mattox believed that a dirt haul road and fingers could be constructed at Pablo Creek, but not within the permitted area and not without problems, such as erosion and problems with cross drain pipes.

Instead of moving forward with the preliminary assessments by Metz or Synergy, Eby focused on a different approach that did not seem as expensive, time consuming, and potentially problematic as dirt haul roads and fingers. Eby determined that it could dredge the small island between the Intracoastal Waterway and Pablo Creek, at a cost of only $65,000, then use the newly created channel to move construction barges into and out of Pablo Creek. Eby believed that dredging was the most economical and least time consuming way to proceed.

At the time Eby made the decision to dredge and use barges for construction at Pablo Creek, it did not consider in detail the additional cost that would be presented by marine-based construction due to the inefficiencies and difficulties inherent therein. The change from land-based construction to marine-based construction at Pablo Creek meant that several more bridge spans would be constructed using marine-based construction than anticipated during the planning and bid phases.

On September 28, 2001, Mr. Erickson sent Mr. Mayforth a letter explaining, and requesting JTA's concurrence with, Eby's idea to dredge and use barges for construction at Pablo Creek. Mr. Erickson did not state that Eby could not construct a dirt haul road and fingers across Pablo Creek, instead setting forth Eby's opinion that dredging and using barges was the most "economical" approach.[38] Mr. Erickson reminded JTA that Eby was "seeking reimbursement for any costs associated with work caused by or the result of the inability to construct the temporary structure as shown on the drawings and as discussed in [special provision 103]." (Ex. 66.)

JTA concurred with Eby's plan to dredge and use barges for construction at Pablo Creek. On October 22, 2001, Dial Cordy requested a permit modification from the permitting agencies since dredging at Pablo Creek was not presented as an alternative in the original permit application or drawings. Dial Cordy explained that Eby was requesting the modification "due to the additional difficulty and higher cost of constructing the fill road versus creating a temporary barge channel." (Ex. 76.) The permitting agencies approved the modification, presumably because dredging would result in less of an impact to the wetlands than the previous-

---

**38.** JTA retained an engineer, Nadeem Zebouni, as an expert witness and listed him in pre-trial submissions as someone who might testify, but decided in the end not to call him to testify at trial. Over JTA's objection, Eby moved to have portions of Mr. Zebouni's deposition transcript admitted into evidence to support its argument that dirt haul roads and fingers could not realistically be constructed at Pablo Creek. (Doc. 135, 137.) While for a variety of reasons the Court would be justified in denying admission of Mr. Zebouni's testimony, it will grant the motion and accord Mr. Zebouni's testimony the weight it deserves.

ly-approved construction of a dirt haul road and fingers across Pablo Creek.

In January 2002, after Eby had completed its construction of the dirt haul roads and fingers, Eby terminated Mr. Erickson as project manager. According to Mr. Nelson, "Mr. Erickson was ineffective at carrying out his duties as Project Manager. His performance had become a concern to us from early in [the] project." (Ex. 329.) Mr. Nelson further indicated "At the time of his termination there were numerous operational issues that had not been addressed and all indicators were pointing to several significant problems with undesirable outcomes for the project." (Ex. 329.)

Eby replaced Mr. Erickson with Chris DuBois, an Eby engineer. Mr. DuBois had worked for Eby for eleven years out of college and was familiar with the soft soil problems Eby had faced because he had been serving as Eby's project engineer for Wonderwood 2. JTA was quick to point out, however, that Mr. DuBois was relatively young, had never served as a project manager, and had never been involved with construction over water or in similar soft soil conditions. Eby later, before Wonderwood 2 completion, replaced Mr. DuBois.

On March 13, 2002, Mr. Rixom finally responded to Eby's August 14, 2001 letter regarding responsibility for what Eby deemed to be extra work for the dirt haul roads and fingers. Mr. Rixom stated that he could not recommend to JTA that Eby be paid any additional money or be given any additional time. Mr. Rixom explained that special provision 103 gave Eby design responsibility, that it was customary throughout Florida for the contractor to design and provide materials for tempo-

rary work structures, that Eby had sufficient information at bid time, that there were no unforeseen conditions, and that vendors had given bidders, including Eby, information and costs for reinforcement materials. Mr. Rixom stated that although he could not recommend payment, JTA was willing to discuss the issue. Mr. Rixom asked Eby to submit further additional details regarding the compensation and time it was seeking.[39]

On April 24, 2002, Eby responded to Mr. Rixom's March 13, 2002 letter by submitting a claim in the form of lengthy and detailed "Request for Equitable Adjustment" ("REA"). (Ex. 2.) The REA asked JTA for $2,687,410.74 in additional compensation and an 81–day contract time extension. The amount represented costs associated with the design and construction of the dirt haul roads, including: costs for Synergy's services, geogrid installation and removal, additional soil borings, wick drain installation, surcharge installation and removal, embankment fill, labor, equipment, and general overhead. The amount included $65,000 to cover the cost of dredging the island between Pablo Creek and the Intracoastal Waterway and the estimated cost for replacing the dredged material following construction.[40] The next day, on April 25, 2002, Eby informed JTA that "Eby has only one claim for delay on [Wonderwood 2]. The delay is a result of the work involved with the Temporary Access Road." (Ex. 81.) Eby later added details, made revisions to certain figures pursuant to JTA's request, and certified its REA in the amount of $2,162,027. This amount included some projected costs.

---

**39.** Although the letter was signed by Mr. Rixom, it was clear from testimony that Mr. Wehner wrote or edited a significant portion of the letter.

**40.** The amount also included $103,000 to cover a claim associated with seal concrete, discussed further in section II(D), infra.

In April 2002, while continuing to disagree over whether Eby was entitled to any additional compensation or time, Eby moved forward with dredging the island between Pablo Creek and the Intracoastal Waterway. Eby completed the dredging sometime in August 2002, after some delay caused by a dredging subcontractor, and thereafter moved toward construction of the permanent bridge at Pablo Creek using barges. Unfortunately, the inefficiencies and difficulties inherent in marine-based construction combined with other forces to make marine-based construction at Pablo Creek problematic for Eby.

As JTA and Jacobs–Sverdrup had predicted during the planning phase, marine-based construction was made more inefficient because Pablo Creek became too shallow at low tide for barges. To make matters worse, Eby's lack of experience with marine-based construction showed through. According to Mr. Rixom: "I saw that when [Eby] moved from land operations to water operations that ... they pretty much didn't seem to completely know what they were doing." (12/15/04 Rixom 107:13–16.) Mr. Mayforth held similar views, opining that Eby appeared very challenged in performing marine-based construction and stating that "[o]n more than one occasion I got the impression they may not have been there before, this may very well have been their first marine project." (12/09/04 Mayforth 61:17–19.)

Ultimately, Eby took months to complete tasks that should have been completed in weeks. Among other problems, Eby had issues with misaligned piles, broken fender pile, surveyors, and foundation work.

During the time period that Eby was dredging, and later using barges for construction at Pablo Creek, Eby knew it was suffering marine inefficiency costs through its monthly internal calculations. Perhaps because it never planned to make a claim against JTA for these costs or because it did not know their amounts to an exact measure, Eby did not tell JTA that it would be seeking marine inefficiency costs in any of their numerous joint progress meetings. Moreover, Eby did not give JTA any daily written progress reports beyond those that it was contractually required to provide when there is no claim or dispute. While recognizing that it is difficult if not impossible to quantify inefficiency costs to an exact measure until after project completion, Mr. Rixom testified that, if he had known that Eby was going to eventually make a claim against JTA for marine inefficiency costs, he would have done something to contemporaneously monitor those costs. According to Mr. Rixom:

> As we've done on the other two claim issues [seal concrete and soft soil claim], we would have, a, kept separate daily records on those activities and, b, we would have tried to come up with an agreement with Eby on a daily basis, or at most a weekly basis, on what the inefficiencies were, and try to come to an agreement, or at least agree to disagree.

(12/15/04 Rixom 121:23–25, 122:1–3.) Mr. Rixom explained that he could have assigned a field engineer to monitor the time it took Eby to perform particular tasks (such as installing piles, pouring footings, or pouring piers) and to determine how much of that time was spent on such things as correcting errors for which Eby alone would be responsible (such as misaligned piles or fixing improperly placed foundations).

By January 2003, Eby internally estimated that its marine inefficiency costs were $1,000,000. However, even at this late date, Eby was not sure that it would "follow up on [the] Pablo Creek issue."

(Ex. 91.) Indeed, when Eby filed its original complaint in this case in January 2003, it included only the claims relating to the dirt haul roads and fingers and the cost of dredging the island between Pablo Creek and the Intracoastal Waterway it had outlined in the April 24, 2002 REA that it previously had provided to JTA.

In March 2003, Eby hired Ronald Lasley, an outside claims consultant, to help Eby determine its losses on Wonderwood 2 and to make its claims against JTA in this case. Mr. Lasley had provided similar consulting to Eby on a number of other construction projects.

Mr. Lasley detailed for Eby various methods that could be used for preparing its claim against JTA for marine inefficiencies at Pablo Creek. At first, Mr. Lasley, with help from Mr. DuBois, performed a "measured mile" analysis that compared actual costs of marine-based construction for Wonderwood 2 with actual costs of land-based construction for Wonderwood 2. Various "measured mile" analyses and spreadsheets were prepared. During the months between March 2003 and July 2003, Mr. DuBois used the analyses to report to Eby's senior management the estimated marine inefficiency losses at Pablo Creek. Eby did not share with JTA either these analyses or any intent to seek marine inefficiency costs.

By June 2003, Eby had prepared a draft REA for Pablo Creek using the "measured-mile" analysis proposed by Mr. Lasley. The draft REA sought $2,713,800.50 in additional compensation and a time extension of 50 calendar days. However, Eby still did not file a claim or indicate to JTA that it would be seeking marine inefficiency costs, much less costs of this magnitude.

Eby's July 2003 management report advised that Eby had put together an additional claim against JTA, indicating that the "value of the claim is $2,713.800." (Ex.

331.) In the same month, Eby terminated Mr. Nelson. According to Mr. Nelson, he refused to certify a claim relating to marine inefficiencies at Pablo Creek because he believed that the problems that Eby encountered at Pablo Creek were caused by Eby's erroneous belief during bid time that Pablo Creek was just a small tributary. Mr. Bean testified that Mr. Nelson was terminated for a "variety of reasons, performance, the ability to provide consistent leadership for the division. There was an erratic, I'd say, attendance, behavior, performance, a variety of things that kind of came together. And I needed to make a change." (12/07/04 Bean 61:20–24.)

At some point after the "measured mile" analyses were performed, Mr. Lasley opined for Eby that the "measured mile" approach would not be an accurate reflection of loss. Mr. Lasley therefore switched to a "modified total cost" approach. The approach was based on Eby's unit price for the "Temporary Access" bid item, with some adjustments, and an assumption that the unit price was reasonable.

Eby's August 2003 management report indicated that "[s]ignificant additional costs have and will be included due to this marine based construction. We anticipate submitting this claim by October 1, 2003." (Ex. 331.) The report also indicated that "Liquidated damages began being assessed by JTA on July 17, 2003 at $10k a day for substantial completion. We have and will ask for additional time with our soft soil and Pablo Creek claims that should extend the contract durations after November 4, 2003." (Ex. 331.)

In October 2003, Eby submitted a second REA to JTA, based on its "modified total cost" analysis, this time requesting damages relating to marine inefficiencies at Pablo Creek, in the amount of

$7,207,702.68 and a time extension of 207 calendar days. A few weeks later, Eby amended its complaint to reflect these claims.

### L. *The Damages*

Eby arrived at its $10,081,739 total damages figure through Mr. Lasley, who relied in part on the time delay report of David Hoctor, another Eby expert. Mr. Lasley opined that Eby's damages for the extra costs of having to construct dirt haul roads and fingers using the Synergy approach were $2,657,697. Mr. Lasley opined that Eby's damages from having to use barges for construction at Pablo Creek were $7,321,042. Finally, Mr. Lasley opined that Eby's damages from the claim relating to "seal concrete" were $103,000.[41]

JTA, of course, disputed these damage calculations. JTA's own expert, Phillip Sandhagen, opined that Eby's total damages were actually less than $1,606,913. Mr. Sandhagen opined that Eby's damages from having to construct dirt haul roads and fingers using the Synergy approach were less than $431,807. Mr. Sandhagen opined that Eby's damages from having to use barges for construction at Pablo Creek were less than $1,175,106. Mr. Sandhagen indicated that he had not even subtracted from these figures about $250,000 to $500,000 in damages that were "self-imposed" by Eby during its construction at

Pablo Creek. (12/17/04 Sandhagen 177:13.)

### II. *Conclusions of Law* [42]

Having now found the facts, the Court applies them to Eby's standard construction law claims: breach of contract, differing site conditions, constructability, and superior knowledge. The first two claims are based on explicit contract provisions; the second two claims are based on an implied warranty and an implied contractual duty. As the plaintiff, Eby has the burden of proving these claims by a preponderance of the evidence.

### A. *Breach of Contract Claim*

Eby's amended complaint alleges a breach of contract claim, though Eby has made it difficult for the Court to determine exactly what Eby is claiming constitutes a breach. In its amended complaint, Eby alleges broadly that JTA breached the contract documents by failing to provide "a suitable and constructable" design for the temporary access structures and by failing to give Eby extra compensation and time. (Doc. 24.) In its summary judgment motion, Eby alleges more narrowly that JTA breached the contract documents by misrepresenting in plan sheet 11 the materials necessary for the dirt haul roads and fingers and that, as a result of this misrepresentation, Eby is entitled to payment under standard specification 2–3.[43] (Doc. 32.)

---

**41.** As discussed further in section II(D), *infra,* the "seal concrete" claim was part of the second REA but was not alleged in Eby's amended complaint, its Federal Rule of Civil Procedure 26 disclosures, and was addressed only in a summary fashion at trial.

**42.** The Court has diversity jurisdiction under 28 U.S.C. § 1332. The parties accept, albeit for different reasons, that Florida substantive law applies. JTA states that Florida law applies since this is a diversity case. Eby states that Florida law applies because the parties contractually agreed that their "rights, obli-

gations and remedies" under the contract documents would be interpreted and governed by Florida law. (Ex. 55 at CF–19, Art. V.) In addition to Florida cases, both parties cite as persuasive authority cases or appeals from the United States Board of Contract Appeals and the United States Court of Federal Claims since they hear numerous cases involving large-scale bidding and construction disputes.

**43.** See section I(I)(2) *infra* for the text of standard specification 2–3.

Now, in its proposed findings of fact and conclusions of law, Eby does not specifically address breach of contract as a separate claim; instead, Eby appears to fold it into the other claims.[44] The Court will follow Eby's latest lead.

### B. Differing Site Conditions Claim

In its amended complaint, Eby alleges that it "encountered subsurface physical conditions which differed materially from those *indicated* in the contract" and, therefore, JTA is required to give Eby additional compensation and time pursuant to the differing site conditions provision found in standard specification 4–3.7.[45] (Doc. 24)(emphasis in original). JTA responds that Eby cannot prove a differing site conditions claim because the conditions that Eby encountered during construction were the exact same conditions reflected in the soil boring information and evident to anyone simply visiting the Wonderwood 2 area or viewing aerial photographs thereof.

A differing site conditions provision is found in most public works contracts. *Hendry Corp. v. Metropolitan Dade County*, 648 So.2d 140, 144 (Fla. 3d DCA 1994)(Baskin, J., dissenting). Indeed, the differing site provision in standard specification 4–3.7 comes directly from the standard specifications used by FDOT for its numerous statewide highway and bridge projects.[46]

To recover under the differing site conditions provision in standard specification 4–3.7, Eby must prove that, during construction, it either encountered subsurface or latent conditions that differed material-

ly from those indicated in the contract documents or that it encountered "unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inherent in the construction provided for in the contract documents." (Doc. 56.)

Eby's differing site conditions claim is a hard one to make given that the wet and marshy conditions evident from the contractually required site inspection and the soil boring information incorporated into the contract documents were entirely consistent with the conditions that Eby encountered during construction. It was apparent to the Court from aerial photographs that the Wonderwood 2 area included large bodies of water deep enough for boating (at least at high tide), numerous smaller and more shallow tributaries, and muddy marshland. As Mr. Erickson testified, his site visit revealed an obvious "wet marsh area" upon which he did not walk because he would have been "maybe up to my knees in water." (12/08/04 Erickson 8:18, 9:7–8.)

That the area might have subsurface soft soil issues was obvious enough from looking at the surface conditions. While the extent of those issues could not be known from the surface, they were certainly made clear or at least "red-flagged" by the soil boring information that was incorporated into the contract documents. The soil boring information conveyed that there were areas of very soft soil, in some places going down to a depth of 45 feet. Eby did not dispute the accuracy of the soil boring information. In fact, Eby's

---

**44.** Perhaps as the case progressed Eby recognized that standard specification 2–3 makes JTA responsible only for certain quantity variations.

**45.** See section I(I)(1) *infra* for the text of standard specification 4–3.7.

**46.** See the *Florida Department of Transportation Standard Specifications for Road and Bridge Construction* (1999) and subsequent versions thereof.

own consultant, Synergy, relied in part on the soil boring information to design the dirt haul roads and fingers that Eby ultimately constructed.

Against this evidence, Eby argues that the plan sheets reflecting dirt haul roads and fingers without soil reinforcement or modification, combined with JTA's pre-bid response to bidders' questions indicating that the filter fabric shown in the plan sheets was for demarcation only, incorrectly indicated soil conditions that could support such structures without soil reinforcement or modification. Eby's expert, Dr. Brumund, explained Eby's argument:

> I have no objection to—or I have no data to suggest that the characterization of the materials, either in material type or consistency, was incorrect. So I agree that the boring logs were accurate.
>
> Where I think the confusion or the misrepresent—the differing site condition comes is ... the design which was proposed to be built over here didn't properly reflect the conditions that were—that were embodied in those borings, and couldn't have been constructed that way.
>
> That's the differing site condition. It's not that the materials were different. It's the way the materials act and would act under the design as proposed.

(12/10/04 Brumund 53:10–23.)

The Court is unconvinced by Eby's argument. While it is clear that neither JTA nor Eby foresaw the extent and expense of the soil reinforcement and modification measures ultimately employed, the soft soil conditions themselves were evident from a site investigation and review of the soil boring information (both part of the contractual undertaking), and were neither latent nor unusual for the area involved. As applied here, Eby's differing site conditions claim is just another way to make a constructability or superior knowledge claim and, therefore, is not cognizable as a separate claim. *See Hardwick Bros. Co., II v. U.S.*, 36 Fed.Cl. 347, 408 (Fed.Cl. 1996) (discussing ways to recover under differing site conditions provision and rejecting differing site conditions claims of contractor for construction of levee on river flood plain).

### C. *Constructability and Superior Knowledge Claims*

Eby's amended complaint alleges that JTA breached an implied warranty of constructability by providing in the plan sheets a design for dirt haul roads and fingers that could not be constructed as shown. JTA responds that Eby cannot recover under this claim because the plan sheets did not present a design specification and, in any event, Eby did not rely on the plan sheets in formulating its bid estimate or constructing the dirt haul roads and fingers. JTA also argues that Eby cannot recover under this claim because any problems were patent and known to Eby, requiring it to seek clarification from JTA before submitting its bid.

Eby's amended complaint also alleges that JTA had "superior knowledge and information with regard to the subsoil conditions" associated with Wonderwood 2 that was not communicated to bidders, and, therefore, JTA is liable under a "superior knowledge" theory. As the case progressed, Eby made this claim more general, to the point that in its proposed findings of fact and conclusions of law it combined its discussion of its superior knowledge claim with its discussion of its constructability claim to assert that JTA breached an implied duty to not give bidders information that will mislead them by providing in the plan sheets a design for dirt haul roads and fingers that could not be constructed as shown, and by failing to disclose settlement that Superior had en-

countered while constructing Wonderwood 2A. JTA responds that Eby cannot recover under this claim because it did not have a Florida law duty to affirmatively provide information relating to a separate project; and because Eby was not, in fact, misled by anything provided by JTA.

A claim of breach of an implied warranty of constructability and a claim for breach of an implied duty to not provide bidders with misleading information are generally thought of as distinct, but have similar goals in ensuring fairness in the bidding and construction process, and an overlapping element of reasonable reliance. The Court will analyze them together, as Eby has done, because the resolution of reasonable reliance will determine the outcome of both claims.

■ The implied warranty of constructability is also known as the *Spearin* doctrine after the holding in *United States v. Spearin*, 248 U.S. 132, 54 Ct.Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918). In *Spearin*, the Supreme Court held that if a contractor agrees to build something for a fixed price, it is not entitled to additional compensation simply because it encounters "unforeseen difficulties." *Id.* at 136–137, 39 S.Ct. 59. However, if the contractor is required to "build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *Id.* at 136, 39 S.Ct. 59.

■ The purpose of the *Spearin* doctrine is to allow contractors to recover when the government does not fulfill the responsibility it has undertaken in preparing and supplying design specifications. *Franklin Pavkov Const. Co. v. Roche*, 279 F.3d 989, 996 (Fed.Cir.2002). Stated an-

other way: "In exchange for the right to direct specifically how a project shall be performed, the government warrants that its directions are not defective." *Concrete Placing Co. v. United States*, 25 Cl.Ct. 369, 375 (Cl.Ct.1992). Given this purpose, the application of the *Spearin* doctrine is appropriate when the particular contract specification in question "most properly can be characterized as a design specification" as opposed to a performance specification.[47] *Aleutian Constructors v. United States*, 24 Cl.Ct. 372, 378 (Cl.Ct.1991).

The *Spearin* doctrine has been recognized by many courts, including Florida courts. *See Florida Bd. of Regents v. Mycon Corp.*, 651 So.2d 149, 153 (Fla. 1st DCA 1995); *Phillips & Jordan, Inc. v. State of Fla., Department of Transp.*, 602 So.2d 1310, 1312–13 (Fla. 1 st DCA 1992); *Miami–Dade Water and Sewer Auth. v. Inman, Inc.*, 402 So.2d 1277, 1278 (Fla. 3d DCA 1981).

In *Jacksonville Port Auth. v. Parkhill–Goodloe Co., Inc.*, 362 So.2d 1009, 1012 (Fla. 1st DCA 1978), a case involving misleading soil boring reports for a dredging project, the Florida First District Court of Appeal cited *Spearin* but did not limit *Spearin's* holding to defective design specifications. The court held: "[i]n furnishing bidders with information as to the nature of the materials likely to be encountered in dredging to the required depth, [the owner] had a duty to furnish information which would not mislead prospective bidders and to not withhold from prospective bidders information that another dredging contractor, in an adjacent area, had encountered extensive rock in dredging to the depth required by [the contractor] here." *Id.* at 1013.

---

47. "Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results to be ob-

tained, and leave it to the contractor to determine how to achieve those results." *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed.Cir.1987).

■ Subsequent Florida cases have cited *Jacksonville Port Auth.* for the proposition that Florida law recognizes an owner's implied duty to provide bidders with information that will not mislead them, comparing it to the implied duty of good faith. *See, e.g., County of Brevard v. Miorelli Eng'g Inc.*, 703 So.2d 1049, 1050–51 (Fla. 1997); *Hendry Corp.*, 648 at 141; *Champagne–Webber, Inc. v. City of Fort Lauderdale*, 519 So.2d 696, 697–98 (Fla. 4th DCA 1988).

Most of the Florida cases recognizing an owner's implied duty to provide bidders with information that will not mislead them arise in the in the context of deciding a sovereign immunity defense and not in a context that calls for an application of the duty to specific facts.[48] The Court accordingly has little beyond Jacksonville Port Auth. to determine the contours of the duty under Florida law. Nevertheless, despite this paucity of case law, it is reasonable to assume that the contours of the duty are similar to the parameters of a *Spearin* implied warranty since their goals in ensuring fairness in the bidding and construction process are the same and since *Jacksonville Port Auth.* relied on *Spearin*.[49] Indeed, one Florida case has indicated that *Jacksonville Port Auth.* is a

progeny of *Spearin* in Florida. *See Miami–Dade*, 402 So.2d at 1278.

■ For a contractor to recover under either a *Spearin* claim or a claim for breach of a duty to provide bidders with information that will not mislead them, it must show that it was, in fact, misled. This requirement has been stated another way to require the contractor to show that it relied on an alleged defect or misrepresentation made by the owner, and that its reliance was reasonable.[50] *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1339 (Fed.Cir.2004); *see also Miami–Dade*, 402 So.2d at 1278 (discussing *Spearin* and *Jacksonville Port Auth.* and indicating in dicta that they apply when the contractor demonstrates "justifiable reliance"); *Hendry Corp.*, 648 So.2d at 145 (Baskin, J., dissenting)(explaining that owner would be liable if it made an affirmative misrepresentation upon which the bidder relied); *Comtrol, Inc. v. United States*, 294 F.3d 1357, 1364 (Fed.Cir. 2002)("It is well-established that a crucial element of … a defective specifications claim is reliance."); *Robins Maint. v. United States*, 265 F.3d 1254, 1257 (Fed.Cir.2001)("Beginning at least with the Supreme Court's decision in *Spearin*, the

**48.** *Hendry Corp.* addressed a contractor's claim for additional costs relating to its demolition of a causeway. The contractor asserted that the owner breached a differing site conditions provision by failing to disclose to bidders its superior knowledge that the causeway was built with wooden, rather than concrete pilings, and that subsurface debris remained from the original causeway construction project. In affirming judgment for the owner, the Florida Third District Court of Appeal cited *Jacksonville Port Auth.* for the proposition that Florida law recognizes an owner's implied duty to provide bidders with information that will not mislead them, but held that Florida law does not recognize any implied duty to disclose facts in its superior knowledge when the owner has not made an affirmative misrepresentation. The dissent disa-

greed, arguing that *Jacksonville Port Auth.* recognized just such a duty.

**49.** *Jacksonville Port Auth.* also relied on *Condon–Cunningham, Inc. v. Day*, 22 Ohio Misc. 71, 258 N.E.2d 264 (1969), which in turn relied on *Spearin*. *See Jacksonville Port Auth.*, 362 So.2d at 1012.

**50.** The Court recognizes that Eby's differing site conditions claim likewise has an element of reasonable reliance, *see Miami–Dade Water & Sewer Auth. v. Inman, Inc.*, 402 So.2d 1277, 1278 (Fla. 3d DCA 1981), *Town of Longboat Key v. Carl E. Widell & Son*, 362 So.2d 719, 721 (Fla. 2d DCA 1978), but discussed it separately since it is based on an explicit contractual provision.

cases have made clear that there can be no recovery unless the contractor has been 'misled'."); *PCL Const. Servs., Inc. v. United States,* 47 Fed.Cl. 745, 786 (Fed.Cl.2000)(explaining that contractor must prove reasonable reliance to recover on a misrepresentation claim); *Green Const. Co. v. Kansas Power & Light Co.,* 1 F.3d 1005, 1009 (10th Cir.1993)(holding that contractor could not recover on implied warranty claim because its reliance on soil information was unreasonable); *Sterling Millwrights, Inc. v. United States,* 26 Cl.Ct. 49, 84 (Cl.Ct.1992)("It is . . . well-settled that [*Spearin*] liability attaches only if the contractor has relied on government design specifications. . . ."); *Stuyvesant Dredging Co. v. United States,* 11 Cl. Ct. 853, 860–61 (Cl.Ct.1987)(discussing reliance in context of *Spearin* claim); *Cook v. Oklahoma Bd. of Public Affairs,* 736 P.2d 140, 149 (Okla.1987)("Reliance is a necessary element of a misrepresentation claim.").

■ Reliance is not considered reasonable if the alleged defect or misrepresentation was "an obvious omission, inconsistency or discrepancy of significance" or if the contractor knew about the defect or misrepresentation during the bidding process but said nothing to the owner. *See E.L. Hamm,* 379 F.3d at 1338–39; *see also Phillips,* 602 So.2d at 1313 (holding that contractor cannot recover on *Spearin* claim when defect was patent); *PCL Const.,* 47 Fed.Cl. at 786 ("When the problem was obvious or actually perceived by the contractor, the contractor must bring the problem to the government's attention, prior to contract award. . . . Failure to do so precludes the contract from being interpreted in the contractor's favor, regardless of the reasonableness of the contractor's interpretation."); *Highway Prods., Inc. v. United States,* 208 Ct.Cl. 926, 530 F.2d 911, 919 (1976)(holding that contractor was not entitled to recover on *Spearin* claim when it knew or was in a position to know

of problems with drawings but did not resolve such problems before it submitted its bid).

■ The gist of Eby's argument is this: JTA misled bidders by giving them plan sheets that depicted dirt haul roads and fingers and indicated specific amounts of component materials without depicting or indicating necessary soil reinforcement or modification measures. This led Eby to believe that it could construct the dirt haul roads and fingers exactly as depicted without any soil reinforcement or modification. JTA compounded the confusion by not indicating on the plan sheets that they were to be used solely to understand the type of temporary access structures and footprint for which environmental permits had been obtained; by not stating in the "scope of work" subsection of special provision 103 that the contractor was responsible for the design of temporary access structures; by not disclosing settlement relating to Wonderwood 2A; and by implying in its pre-bid response to bidders' questions that there would be little or no settlement.

What is lacking from Eby's case, and even from its proposed findings of fact and conclusions of law, is a showing that Eby relied on the plan sheets or any other alleged misrepresentations by the time it submitted its bid, or that such reliance would have been reasonable. To the contrary, as discussed more fully below, the evidence showed that Eby could not have reasonably determined that the plan sheets presented a design specification; that by the time it submitted its bid, Eby knew that the dirt haul roads and fingers would require more than what was reflected on the plan sheets; and that Eby failed to disclose to JTA, or seek clarification from JTA on, any inconsistency between the plan sheets and the actual requirements.

Both the "Notice to Contractors" and the standard specifications stated that bidders were expected to examine the construction site and contract documents, which included the soil boring information, before submitting a bid package. Indeed, Eby knew from an early point in the bid process that it should conduct both an "extraordinary site investigation" and a geotechnical evaluation. (Ex. 177.)[51] These two things—a site investigation and a review of the soil boring information— would have made it clear to a reasonably prudent contractor that filter fabric and fill alone could not be placed over Pablo Creek and other areas with soft soils to create effective dirt haul roads and fingers for the heavy, indeed massive, construction equipment.[52]

First, as discussed in the differing site conditions discussion, a reasonable site investigation would have shown that Pablo Creek was a wide body of water deep enough at high tide for boating, and adjacent marshland that was muddy enough to cause a person to sink down. Mr. Bean observed on his first site visit, "I saw a lot of water, marsh conditions" (12/07/04 Bean 37:23) and admitted that Eby estimators knew they were dealing with "marsh and all this water" (12/07/04 Bean 83:24–25, 84:1). See Cook, 736 P.2d at 146 ("The

project entailed the renovation of existing fish ponds. That fact alone, absent any specific site inspection provision, should have alerted a bidder to the possibility of wet conditions."). There was persuasive testimony that Eby did not fully appreciate the extent of the wet conditions because it erroneously believed, through no fault of JTA's, that Pablo Creek was a small tributary. There also was persuasive testimony that Eby did not have experience with similar projects over soft soil conditions, forming the reasonable implication that Eby did not know from its site investigation what construction of dirt haul roads and fingers over such soft soil conditions would entail.[53]

Second, a reasonable review of the soil boring information would have shown areas of very soft soil. Bidders were directed to "examine boring data, where available, and make [their] own interpretation of the subsoil investigations and other preliminary data, and ... base [their] bid on [their] own opinion of the conditions likely to be encountered." (Ex. 23 at 10, § 2–4.) Forming an opinion from the soil boring information that there were areas of very soft soil would not have required a geotechnical evaluation from an expert.[54] Even without a geotechnical engineering evaluation, Superior was able to determine

---

**51.** Eby asked for at least one week to, among other things, conduct an "extraordinary site investigation" and a geotechnical evaluation. (Ex. 177.) Either because of Eby's request or otherwise, JTA extended the bid time by one week. Eby had sufficient time during the 44–day bid process, at the very least, to conduct a site investigation and review the soil boring information that had already been compiled by CSI.

**52.** Testimony reflected that the cranes for construction weighed 250 tons with the capacity to lift bridge beams or columns weighing 90,000 pounds.

**53.** Mr. Erickson admitted that Eby knew almost immediately after construction began,

with little more than site clearing having begun, that something more needed to be done than "placing a minor filter fabric on the ground and pushing dirt out there." (12/08/04 Erickson 112:19–20.)

**54.** There was credible testimony from one of Eby's experts that it would be the exception, not the rule, for a bidder to incur expert expenses without assurance that its bid would be accepted. Indeed, "[a]s a general rule, bidders are not obligated to conduct their own invasive explorations of subsurface or other concealed site conditions, consult scientific treatises or scholarly work, or be held to any standard higher than simply a 'reasonable and prudent' bidder." 1 PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., LAW § 2:64 (2005).

from its inspection and review of the soil boring information that the soil in the areas where they would build temporary access structures generally was "weak and extremely marginal" and that there would be significant settlement of any dirt placed thereon. (12/16/04 Kelley 27:6–7.) Moreover, Eby's own expert, Dr. Brumund, agreed that "a reasonably prudent contractor who actually looked at [a particular boring] would know you had soft materials going down 45 feet." (12/10/04 Brumund 71:22–25.)

If it was not clear from a site investigation and soil boring information that more would be needed to form effective dirt haul roads and fingers, it would have been made clear to a reasonable contractor listening pre-bid to the soft soil issues raised by the vendors of reinforcement material whose associated experts had examined the soil boring information and construction site. According to both Mr. Erickson and Mr. Kelley of Superior, the vendors expressed their concerns about the soft soil and their respective expert opinions that dirt haul roads and fingers for Wonderwood 2 would require engineered soil reinforcement measures to support construction equipment. Mr. Erickson candidly testified about his pre-bid meeting with a Contech representative: "[H]e came into the office and laid out his work, within a day before the bid, explaining that we should be utilizing all the stuff that they're having, which amounted to millions of dollars, because he felt that's what was needed to make the project work." (12/08/04 Erickson 93:8–12.)

Contrary to Eby's argument, Eby did not disregard the vendors' expert opinions as nothing more than sales pitches; in fact, Eby recognized that the vendors employed or were associated with specialty engineers who had examined the soil boring

information and site and who knew more about soil reinforcement materials than any of the Eby estimators. Indeed, Eby had business dealings with Contech "for years and years." (12/08/04 Erickson 92:18–19.) In reliance on the information they provided, Eby considered different types of soil reinforcement material and ultimately included in its final estimate for the "Temporary Access" unit price the high-strength woven Mirafi® fabric from RH Moore and additional labor costs related thereto. Had Eby believed that the plan sheets stood for the proposition that nothing more than filter fabric was needed, Eby would not have included the more expensive, high-strength Mirafi® fabric.

Eby was not misled by the questions and answers that JTA published during the bid process and made part of the contract documents. Although Eby asserts that the questions and answers misled bidders into believing that there would be little or no settlement, this appears to be a post hoc argument made for this case. Mr. Erickson testified that the questions and answers told Eby what plan sheet 11 explicitly stated: that the specified fill number did not account for settlement. While Mr. Erickson further testified that by not affirmatively discussing settlement in the areas of the temporary access structures, "why would anybody think that there was a problem?" (12/08/04 Erickson 106:–10), Eby's actions in accounting for settlement and soil reinforcement materials in the estimates it prepared belies any contention that it was misled by the questions and answers, or by what was not in the questions and answers. The Court finds that, if anything, the questions and answers represent only a missed opportunity for Eby to seek further clarification on any points of confusion with respect to the "Temporary Structure" bid item.[55]

---

55. The Court further finds that JTA did not have a duty to disclose any settlement that

occurred with respect to the temporary access

Eby likewise did not feel that it would be constrained to follow the plan sheets in a precise manner; in other words, it did not act as a contractor would if it believed it was faced with design specifications. If it had, it would have relied on its estimate in its draft Bid Item 111, which was substantially based on the plan sheets. Instead, Eby's final estimate for the "Temporary Access" unit price relied on its Bid Item 110, which anticipated that Eby would use different amounts of material than the amounts indicated on plan sheet 11, would use some materials not listed on plan sheet 11, would flip the dirt haul road from the south side to the north side of Greenfield Creek, would replace sheet pile with rip rap at Pablo Creek, and would change the dimensions of some of the fingers in other areas. This evidence belied Eby's contention that it was constrained by JTA's "design" of the temporary access structures.

Moreover, whether ambiguous in other ways or not, special provision 103 clearly indicated to bidders that the unit price for the "Temporary Structure" bid item was to include all costs associated with design, materials, labor, installation, removal, and disposal. It further indicated that the contractor could choose any type of temporary

access structure so long as it assumed responsibility for obtaining all necessary permit revisions and the Engineer's approval, and conformed to any limitations in the plans and permits.[56]

During the bid process, therefore, Eby was not faced with a subtle or hidden defect; it was faced with, and in fact accounted for (albeit inadequately), the obvious: that plan sheets provided by JTA did not indicate soil reinforcement or modification measures but a site investigation, soil boring information, and vendor information as a whole indicated or should have indicated to a reasonable contractor that such measures were necessary to build dirt haul roads and fingers that would support construction equipment. Rather than seeking any clarification from JTA, however, Eby submitted its bid knowing, as it stated in its post-bid review meeting, that "Platform 'soft' ground may cause [the dirt haul roads and fingers] to fail." (Ex. 53.) The post-bid review meeting clearly evidences that Eby knew this before it submitted its bid because nothing occurred, and no new information was discovered, in between the time it submitted its bid and the time it held the post-bid review meeting.

structures for Wonderwood 2A either at the pre-bid conference, in the published questions or answers, or otherwise in the contract documents. Not only is there a question under Florida law whether it had any legal duty to do so, but there was insufficient evidence that Wonderwood 2A presented substantially similar conditions. Indeed, Mr. Kelley of Superior testified that Superior conducted an extensive site investigation of Wonderwood 2 even though it was working on Wonderwood 2A because Superior believed that Wonderwood 2 presented different conditions.

**56.** In viewing the bid process in retrospect, the Court agrees that JTA could have made its intent more clear by adding a notation on the plan sheets or elsewhere in the contract documents that it was not providing a design for

the dirt haul roads and fingers, and that the plan sheets relating thereto were to be used solely to understand the type of temporary access structure and footprint for which environmental permits had been obtained, as it did for Wonderwood 1. JTA also could have included the statement "[a]ssume responsibility for the design of the temporary structure" in the **"Scope of Work"** subsection of special provision 103 rather than the **"Materials"** subsection to obviate any questions on whether the contractor was responsible for designing the temporary work structures as a whole or just their component materials, such as sheet pile. The evidence also showed that, more likely than not, JTA itself did not fully appreciate the difficulties and costs of temporary access structures for the project.

The Court acknowledges that preparing bids is a hectic and stressful process, particularly when a bidder has, as here, only 44 days to do so. The evidence disclosed that bidders often base their bids on imperfect information and that it is impractical from a time and cost standpoint to "dot every 'i' and cross every 't'" before submitting a bid. In Mr. Beans words, "There's thousands and thousands of decisions and judgments" that a contractor makes when preparing a bid. (12/07/04 Bean 79:15–16.) The Court further acknowledges that Eby believed it would have gotten an unsatisfactory response from JTA if it had sought clarification. But none of these circumstances relieve Eby from taking responsibility for the bid risks it assumed:

> [C]ontractors are business men, and in the business of bidding on Government contracts they are usually pressed for time and are consciously seeking to underbid a number of competitors. Consequently, they estimate only on those costs which they feel the contract terms will permit the Government to insist upon in the way of performance. They are obligated to bring to the Government's attention major discrepancies or errors which they detect . . . or else fail to do so at their own peril.

*Blount Bros. Constr. Co. v. United States,* 171 Ct.Cl. 478, 346 F.2d 962, 972–73 (1965).

The purpose of the rule requiring contractors to bring obvious or actually perceived problems to the owner's attention is twofold:

> First, it protects the integrity of government procurement by ensuring that all bidders bid upon the basis of the same terms and specifications, and that no contractor takes advantage of a government drafting error. Second, it promotes the efficient administration of government contracts by encouraging contractors to raise potential problems before the fact, and generally requires less time and effort, thereby reducing the likelihood of extra-cost claims on the project and expensive and time-consuming litigation.

*PCL Const.,* 47 Fed.Cl. at 787.

If Eby had received an unsatisfactory response from JTA, it then could have evaluated its risk and chosen to not bid on Wonderwood 2 or accounted for the risk by adjusting its unit price upward. By submitting its bid without seeking clarification, Eby assumed the risk that more extensive soil reinforcement and modification measures would be needed. *Space Corp. v. United States,* 200 Ct.Cl. 1, 470 F.2d 536, 538 (1972)("[I]t is difficult to see how anything short of an inquiry . . . so as to ascertain the actual contract requirements, could be considered reasonable conduct. It is clear that when a contractor is faced with an obvious omission, inconsistency or discrepancy of significance, he is obligated to bring the situation to the government's attention if he intends subsequently to resolve the issue in his own favor."). This was especially important here where temporary access was the "riskiest" part of the project. (12/16/04 Kelly 41:6.)

Having failed to prove reliance, or that reliance was reasonable, Eby cannot recover under its constructability or superior knowledge claims.

### D. Seal Concrete Claim

At trial, Eby offered a few exhibits and some testimony relating to its "seal concrete" claim of $103,000. JTA objected to the claim, asserting that Eby did not plead it in its amended complaint and did not identify it in its Federal Rule of Civil Procedure 26 disclosures. Eby likewise did not address it in its summary judgment motion and mentions it only in passing, in a summary fashion, in its proposed

findings of fact and conclusions of law. The Court concludes that Eby failed to properly plead this claim by not including it in its amended complaint and therefore cannot recover on it in this case.[57]

### III. *Conclusion*

In *Hardwick Bros. Co. II v. United States,* No. 97–5090, 1998 WL 539463, at *1 (D.C.Cir. Aug. 24, 1998), another case involving a large construction dispute, the court begins its opinion as follows: "This is a sad case, for it appears that a government contractor of proven reliability and competence lost [millions] on a contract ... [T]here is no basis at law to provide the relief the contractor seeks. That it completed the project rather than walking away is to the contractor's credit but likewise provides no basis for relief." So it is here.

Based on these findings of fact and conclusions of law, it is hereby **ORDERED**:

A. The Clerk is directed to separately enter judgement in favor of defendant Jacksonville Transportation Authority and against plaintiff Martin K. Eby Construction Co., Inc., on all claims.

B. Plaintiff Martin K. Eby Construction Co., Inc.'s ore tenus motion to submit deposition testimony of Nadeem G. Zebouni (Doc. 135, Doc. 137) is **GRANTED**.

C. The Court retains jurisdiction to determine any issues of attorneys' fees and costs. Any motions relating thereto must be filed no later than **April 22, 2005**.

---

57. Given the Court's decision that Eby has failed to prove its claims by a preponderance of evidence, the Court need not decide issues relating to whether special provision 103 was ambiguous; whether Eby satisfied contractual conditions precedent to recovering damages for marine construction at Pablo Creek; whether such damages are precluded by the doctrine of sovereign immunity; whether Eby failed to mitigate its damages; or whether Eby proved its damages.